[Civ. No. 1179.   Third Appellate District.—March 25, 1914.]

## J. W. FORGEUS, Substituted for Santa Cruz Bay View Company (a Corporation), Appellant, v. COUNTY OF SANTA CRUZ et al., Respondents.

NAVIGABLE WATERS—ORDINARY HIGH WATER MARK—MEANING OF EXPRESSION.—By "ordinary high water mark" is meant the limit reached by the neap tides, that is, those tides which happen between the full and change of the moon twice in every twenty-four hours.   The expression does not refer to the limit that the monthly spring tides reach, tides which occur only at the full and the change of the moon.

ID.—TIDE LANDS—EVIDENCE AS TO BOUNDARIES—HIGH WATER MARK. In this action involving the ownership of land fronting on Monterey Bay near Twin Lakes in Santa Cruz County and lying south of the highway known as the East Cliff Drive, the evidence does not support the conclusion of the trial court that the northern limit of ordinary high water in Monterey Bay is as far north as the southern boundary line of such drive, but rather that such water mark lies some two hundred and fifty feet south of the southern boundary of the drive.

ID.—GRANT FOR HIGHWAY—RIPARIAN ESTATE OF GRANTOR—ACCRETIONS. A grant of a right of way over land fronting a bay to a county for purposes of a highway does not impair the grantor's riparian right or estate and entitle the county to accretions to the land. And the fact that the accretions are due to the act of the county in raising the roadbed along the right of way does not secure to the county the right to the alluvion as an addition to its right of way.   The alluvion is an accession to the fee, not to the easement.

APPEAL from a judgment of the Superior Court of Santa Cruz County.   Lucas F. Smith, Judge.

The facts are stated in the opinion of the court.

H. A. van C. Torchiana, W. P. Netherton, and Stratton, Kaufman, & Torchiana, for Appellant.

Benj. K. Knight, for Respondents.

BURNETT, J.—The plaintiff is the owner of a tract of land near Twin Lakes in Santa Cruz County, the bay of Mon-

terey being the southerly boundary line of said land. One of plaintiff's predecessors in interest, J. C. Kimble, by deed dated September 4, 1890, granted to the county of Santa Cruz, for public use as a highway, street, or road, a strip of land sixty feet in width, now known as the East Cliff Drive. It is the contention of appellant that the road divided the Kimble land into two parts, leaving north of the road high land and south of the road beach land. The tract south of the road is the one in dispute. It consists of sand hills, or dunes, and a regular beach, and there is no dispute that for years teamsters have gone on to this tract and hauled away large quantities of sand, it being particularly adapted for plastering. In January, 1907, the Santa Cruz Bay View Company, the predecessor in interest of plaintiff, constructed a fence around the property it claimed to own south of the road. Openings were left in the fence for the use of the public in going on to the beach, and no objection seems to have been made to any one carrying away drift wood, but the fence excluded the teams and, under the direction of one of the supervisors and in accordance with the advice of the district attorney of the county, the north fence was torn down and the teamsters drove again upon the beach for the purpose of getting sand. A complaint was thereupon filed in the superior court for an injunction against the county of Santa Cruz and the board of supervisors as a whole and the members thereof individually to enjoin them from interfering with, molesting or destroying said fence or any part thereof and them or their agents from entering upon said premises. The court found that all the land south of said right of way is tide land which is covered by the neap tides, that plaintiff has no right, title, or interest therein, and that the fence constructed was and is a public nuisance, defendants being entitled to remove the same and to prevent the construction or rebuilding thereof at any point south of said right of way deeded by said Kimble to the county of Santa Cruz.

Manifestly—and it is so conceded—the vital point in the case relates to the location of the south line of plaintiff's land, and this depends upon the northern limit of ordinary high water in Monterey Bay. It is the contention of plaintiff that the ordinary high water mark is two hundred and fifty feet

or thereabouts south of the southern boundary of said East Cliff Drive while, as must be apparent, the claim of defendants, which was approved by the court, is that said boundary of the drive corresponds with said ordinary high water mark.

If plaintiff's position is correct or if said ordinary high water mark lies at any considerable distance south of said drive, it would follow that the court's findings cannot be sustained.

There is no dispute as to the significance of the expression "ordinary high tide," or that this line marks the said boundary of plaintiff's land according to the common law and the rule which prevails in this state. This terminology does not refer to the "limit which the monthly spring tides reach, tides which occur only at the full and the change of the moon. . . . The limit of the monthly spring tides is, in one sense, the usual high water mark, for as often as those tides occur, to that limit the flow extends. But it is not the limit to which we refer when we speak of 'usual' or 'ordinary' high water mark. By that designation we mean the limit reached by the neap tides, that is, those tides which happen between the full and change of the moon twice in every twenty-four hours." (*Teschemacher* v. *Thompson,* 18 Cal. 11, [79 Am. Dec. 151]. See, also, Gould, on Waters, p. 61; *Long Beach Land & Water Co.* v. *Richardson,* 70 Cal. 206, [11 Pac. 695], *Valentine* v. *Sloss,* 103 Cal. 215, [37 Pac. 326, 410], and section 670 of the Civil Code.)

Turning to the evidence, we can find no substantial support for the conclusion that the ordinary high water mark is as far north as the southerly boundary line of said drive. As the controversy is largely one of fact it seems advisable to quote quite extensively from the testimony of the witnesses.

It appears that, in 1896, by the United States Geodetic Coast Survey, the line of ordinary high tide was located all along the coast and at different locations were placed, so as to insure permanency as far as practicable, bench marks, a bench mark being a "mark affixed to a permanent object in tidal observations, or along a line of survey, to furnish a datum level." The bench mark for the coast of Santa Cruz was placed on the stone steps of the court house at Santa Cruz. According to custom, said geodetic survey branch of the government, in 1910, published its tide tables for 1911

by means of which, in connection with said bench marks, it is not disputed that the ordinary high water line of that date can be determined and located.

A. M. Baldwin, the county surveyor of the county of Santa Cruz, in April, 1911, established the line of ordinary high water along Twin Lakes, using said bench mark as the base for his survey, in connection with the data furnished by said tide tables. He explained, carefully and technically, his method of procedure. The result of his testimony, in connection with the map compiled by him according to his survey, would be the conviction that the northern boundary line of the ordinary high tide is something over 240 feet south of said drive and that it corresponds substantially with the meander lines of the survey under which the United States patent was granted to plaintiff's predecessors in interest.

The foregoing surveys and calculations may be, of course, faulty; but if they cannot be held to be conclusive of the controversy, their significance as a factor is readily apparent. It may be stated that the county surveyor did not pretend to testify from his personal observation and knowledge of the tides.

E. R. Bennett, the minister of the Baptist church, which owns some property adjoining the beach in controversy, testified: "I have known the property situated south of the road marked 'East Cliff Drive,' down to the Bay of Monterey, more or less intimately for twelve years. For five years I have passed the property very often and I have observed it at those times. I have been on the property. I remember in the year 1907 when the Santa Cruz Bay View Company built a fence on that property. I looked over the place, described as 'sand bluff' on the map, about three days ago, and it seems to be about in the average condition of the past several years. Taking the average, summer and winter through, it is very nearly the average tide at the present time." He further testified that the beach had "not changed in any particular degree in the last twelve years, that is, no permanent change is particularly noticeable. There have been temporary changes, quite a number of slight ones in the last twelve years" and that the ordinary high tide for twelve years has reached the line as claimed by plaintiff.

C. A. Wood, another witness, testified: "I have known the property south of the county road, north of the bay of Monterey, and belonging to Mr. Forgeous, for twelve or fourteen years. I have seen the property every morning for the last ten years. About one hundred and thirty feet south of the county road is a jump off place, and sand bluff, as it is called on the map. It may be one hundred and eighty feet from the road. There has always been a bluff there, more or less. I have had occasion to observe the flow of the tides there as I pass along, and I am naturally interested to see how high it comes. The ordinary high tide comes to about the bluff. That is the way that bluff is formed. I have seen it about every day."

The plaintiff testified: "I have noticed the effect of the tide along on this beach during the years I have been interested there, since 1905. Ever since I have known the property there has been from 140 to 180 feet of good dry beach all the way."

John J. Stewart has resided at Twin Lakes for about seven years within two hundred yards of the beach, and he testified: "I have noticed the ebb and flow of the tides quite frequently for the last seven years. I know the sand bluff. The ordinary tides come close to it, but the extreme tides may go over the top and spread over the lap of the beach. The ordinary tides come nearly to the said bluff. I estimate that the low tide is forty feet below there, and the average tide, I suppose, would be something like half way between the distance and the bluff."

J. E. Armstrong testified: "I have resided in Santa Cruz about 30 years and I know Mr. Forgeus's property, being acquainted around Twin Lakes and with the beach there. I know the fence, marked on this map, which is running about parallel with the Cliff Drive, and I had occasion recently to look at the beach south of that fence. I know the sudden jump off in the sand there, which is marked on this map as sand bluff. That is where the breakers dip up and slide back again. During my residence here I have had occasion frequently to notice the tides there south of this sand bluff on the Forgeus property in a general way. The ordinary high tide would be about half way from the lower condition of the water to the top of the sand bluff."

Thus far, manifestly, the only reasonable inference that could be indulged is in favor of appellant's contention. This inference is strengthened by circumstantial evidence which we deem it unnecessary to detail, and the conclusion is left undisturbed and unaffected by the testimony offered on behalf of respondents.

It is true that a large number of witnesses was called by defendants, but a careful examination of the record shows that the facts concerning which they testified are not at all inconsistent with appellant's position, nor would it be a fair deduction from their testimony that the ordinary high tide reaches or approximates the county road. The attention of these witnesses was directed to unusual tides, storms, and floods, and this circumstance renders their testimony easily reconcilable with that of plaintiff's witnesses. We may take the testimony of Adolph Bodeman as a fair example for all: "I know the land here in question, and am familiar with that part of the country. I have gone over this land here in question, at the point where the East Cliff Drive crosses over the tracks of the Union Traction Company just before reaching the Twin Lakes station and I am familiar with that country. . . . I have seen the tides, the waters from the bay up near the tracks of the Union Traction Company and near the lagoon, quite often there. In reference to the crossing where the street crosses the tracks of the Union Traction Company, I have noticed water running there, once decidedly in March, 1905, it was after dark. . . . The water was on both sides of the road, a little further east of the crossing. The water was running over the county road and over the track both. It was the water from the bay. During the eight years I have been a street-car conductor all told I have been five years on the run between Santa Cruz and Capitola," and on cross-examination he testified that he had seen the water as high as the tracks only once and that was when there had been a high wind during the day.

Another theory contended for by respondents is based upon the testimony of some of the witnesses that by reason of accretion the beach has been extended south of the road, and is to the effect that "if this accretion is subject to private ownership it belongs to the county because the county owns the sixty-foot roadway against which the accretion banks and

furthermore, that Kimble, or his successor, the appellant, cannot take advantage of their own wrong in closing up the channel by erecting an obstruction on public land and claim this sand as an accretion.''

The facts, however, are not as expressed and implied in the foregoing statement. It is not a fair construction of the deed of September 4, 1890, from J. C. Kimble to the county of Santa Cruz that it conveyed the fee. The intention was clearly to grant merely a right of way, the *habendum* clause being: ''To have and to hold said strip of land, unto the said party of the second part, for the uses and purposes of a public highway or street.'' The riparian estate of Kimble was, therefore, not severed from the ocean. ''A riparian right is not destroyed by the acquisition of an easement for a highway, railroad or canal along the shore.'' (*New Jersey Zinc & I. Co.* v. *Morris Canal & Bkg. Co.*, 44 N. J. Eq. 398, [1 L. R. A. 133, 15 Atl. 227].)

Again, if any accretion or reliction was formed it was not caused by any act of Kimble or his successors in interest, but it was due to the act of the county in raising the roadbed along said right of way. It could hardly be contended that the county by such artificial means could secure the fee to the alluvion as an addition to its right of way. The alluvion would be an accession to the fee and not to the easement. In *Tatum* v. *City of St. Louis,* 125 Mo. 654, [28 S. W. 1003] it is said: ''The riparian owner is entitled to the land formed by gradual and imperceptible accretions from the water, regardless of the cause which produced it. This right he cannot be deprived of by the acts of others over whom he has no control, and for which he is in no way responsible. It was pertinently said by Mr. Justice Swayne, in *St. Clair County* v. *Lovingston,* 23 Wall. 66, [23 L. Ed. 59]: 'It is insisted by the learned counsel for the plaintiff in error that the accretion was formed wholly by obstructions placed in the river above, and hence that the rules upon the subject of alluvion do not apply. If the fact be so, the consequence does not follow. There is no warrant for the proposition. The proximate cause was the deposit made by the water. Whether the flow of water was natural or affected by artificial means is immaterial.' '' There are many decisions to the same effect and they recognize the principle, as expressly stated in some

of them, that the right of alluvion to be formed in the future is an inherent and essential attribute of the original proprietorship and is a vested right with all the usual incidents of such property interest.

Clearly, there is a distinction between this case and that where a structure is erected, by the state or municipality, on land below the line of ordinary high water. In the latter case the deposit of alluvion caused by such structure would not inure to the benefit of the riparian owner. This is pointed out in *Dana* v. *Jackson Street Wharf Co.,* 31 Cal. 118, [89 Am. Dec. 164], wherein it is held that "In case of purpresture or encroachment by the erection of a wharf in the bay of San Francisco beyond the city front, the right to recover possession is in the people, and not in the owner of the land adjoining on the city front," and furthermore: "The owner of a lot upon the water-front of San Francisco, as established by statute, below low water mark, is not a "riparian purprestor' in the sense in which that term is used in the law of tide waters, for the water-front of San Francisco is of statutory construction." Therein the court though, recognizes the general rule as follows: "as to the lands gained from the sea by alluvion, i. e., by the washing up of sand or earth, so as in time to make *terra firma,* the law is held to be that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. (2 Blackstone's Commentaries 61.)"

It is also apparent that quite a different situation is presented in the case of *San Pedro etc. R. R. Co.* v. *Hamilton,* 161 Cal. 610, [37 L. R. A. (N. S.) 686, 119 Pac. 1073]. This is shown by the following quotation from the opinion: "That question may be thus broadly stated. When the constitution (art. XV, sec. 3) declares 'all tide lines within two miles of any incorporated city or town in the state, and fronting on the waters of any harbor or estuary, bay, or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships or corporations,' does the language forbid the leasing for a term of any part of such lands? For the consideration of the question stated, 'tide lands' as thus used in the constitution will be construed more broadly than in the ordinary signification of lands covered and uncovered by the daily efflux and reflux of the tide. It

will be construed to embrace lands properly described as sub-merged lands (*Ward* v. *Willis,* 6 Jones' Law (N. C.) 183, [72 Am. Dec. 570], such as, in major part, the lands here in controversy unquestionably were. The phrase will be so construed to carry out the manifest intent of the framers of the constitution, to protect the harbors of cities and towns from falling into private monopolistic ownership.'' It is thus to be seen that the case had nothing to do with the subject of accretion or the interpretation of a patent from the general government prescribing as one of the boundaries of the land a navigable bay.

The case of *Pollard's Lessee* v. *Hogan,* 3 How. 212, [11 L. Ed. 565], has no bearing upon the question before us. The point of controversy there was whether the United States or the state of Alabama was clothed with sovereignty over lands on navigable waters below ordinary high water and it was held by the United States supreme court that this power belonged to the state and that the ''right of the United States to the public lands and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant land in Alabama which was below usual high water mark at the time Alabama was admitted into the Union.'' The United States having issued its patent to land below the usual high water mark, the patent was therefore void and conveyed no title and manifestly no accretion could inure to the benefit of the patentee.

The decision in *Cook* v. *McClure,* 58 N. Y. 437, [17 Am. Dec. 270], turned upon the opinion of the court as thus expressed: ''I think the language of the deed indicates a clear intention to establish a fixed and permanent line, and not one changeable by the changes in the high water mark of the water in the pond.'' It was therefore held that whether alluvium had been formed had nothing to do with the location of the boundary of the grantee's land.

*Nixon* v. *Walter,* 41 N. J. Eq. 103, [3 Atl. 385], was similar to the New York case, and it was held that the deed conveyed the land by explicit boundaries, one of which was ''high water mark'' and that the line thus given was a fixed and permanent one—''the line of high water at the date of the deed and does not follow the changes of the high water

mark.'' No one, of course, will deny that the parties to a deed may fix the line of the ordinary high tide as it exists at the time of the execution of the deed as a boundary for the land conveyed.

*Eichelberger* v. *Mills Land etc. Co.,* 9 Cal. App. 628, [100 Pac. 117], to the extent that it is in point at all, supports the position of appellant, inasmuch as it is held that a tract of land described as bordering upon the Pacific Ocean is delimited by ''the line to which the flow of the water reaches at ordinary or neap tide, unaffected by wind or wave, not the line of extreme high tide nor extreme reach of the wash of the waves.''

In *Hendricks* v. *Feather River Canal Co.,* 138 Cal. 423, [71 Pac. 496], the familiar principle is reaffirmed that in determining the correctness of boundaries of public lands the government plat and survey which show that the land is to be bounded by a river must be construed as referring to the margin of the river and must prevail over the meander lines run by the surveyor where they do not coincide and that the meander lines cannot limit the grant in the patent. No question of that kind arises here. As claimed by appellant: The south boundary line of plaintiff's land was established by the survey of the county surveyor. It coincides substantially with the points on the beach established in 1858 by the surveyor of the United States government and with the map and official plat of the survey of the lands returned to the general land-office by the surveyor-general and mentioned in the patent of 1867 and it coincides with the data contained in the United States geodetic survey issued in 1908 and with the data contained in the official book known as ''The result of Spirit Leveling in California, 1897–1907'' and also with the rational inference arising from the testimony of all the witnesses.

As to the suggestion that the physical condition of the beach was changed by the closing of one of the two channels extending to the ocean from what is known as Woods Lagoon, we think no comment is required. If we concede that the circumstance may have caused the said line to shift, it does not militate in the least against appellant's claim.

We think that it appears by the transcript that the judgment herein has deprived plaintiff of a substantial right and the judgment is therefore reversed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 23, 1914.