**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gerald ARANSON, et al.,**
**Defendants-Appellants.**

**No. 77-2295.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 1982.

Decided Jan. 10, 1983.

Rehearing Denied May 13, 1983.

Edgar B. Washburn, Washburn, Kemp & Wagenseil, San Francisco, Cal., Guido R. Smith, Costa Mesa, Cal., for defendants-appellants.

David C. Shilton, Washington, D.C., for plaintiff-appellee; Dirk D. Snel, Washington, D.C., on brief.

Steven J. Bloxham, Tribal Atty., Parker, Ariz., for intervenor Colo. River Indian Tribes.

Anthony B. Ching, Solicitor General, Phoenix, Ariz., for intervenor State of Ariz.

Before TRASK and SNEED, Circuit Judges, and EAST,* District Judge.

SNEED, Circuit Judge:

The proper resolution of this appeal has proved as difficult to divine as determining the course of the Colorado River in the Palo Verde Valley during the period of time with which this case is concerned. Both have proved elusive, and, even now, some doubt with respect to both remains. The appeal is from the decision of the district court adjudging certain lands in what is referred to as the Olive Lake region of the Palo Verde Valley to be the property of the United States, acting as trustee for the Colorado River Indians, and ordering appellants to pay damages because of their wrongful occupation of those lands. Appellants maintain that the district court should have granted their motion for a new trial because of a change in the applicable law. Appellants also contend that the district court erred in concluding that the Colorado River Indian Reservation included the easterly half of the bed of the Colorado River. Affirmed in part and reversed and remanded in part.

I

In 1865, Congress created the Colorado River Indian Reservation by setting apart certain lands within what was then the Territory of Arizona. Act of Mar. 3, 1865, ch. 127, 13 Stat. 541, 559. The boundaries of the Reservation were modified or redefined by executive orders issued on November 22, 1873; November 16, 1874; May 15, 1876; and November 22, 1915. *See Executive Orders Relating to Indian Reservations, 1855–1922,* pt. I, at 6, 7; pt. II, at 5, 6 (1975).

The Reservation extended westward to, and in some places beyond, the Colorado River, which formed the boundary between California and Arizona. The river, however, did not maintain a constant course. Over the years it carved out various channels through the Palo Verde Valley. Three of those channels are critical to this case. For our purposes, the 1908 channel refers to the course followed by the river before the completion in 1909 of the Laguna Dam, which is located downstream from the Palo Verde Valley. It appears in Appendix A to this opinion. In the decade following completion of the dam, the river moved gradually westward, as soil was eroded from the California bank and deposited on the Arizona side. By 1915 its location was as depicted by Appendix B, and by 1919 the course of the river had formed a bend or loop known as the "Olive Lake Bend" which Appendices C and D reflect. We shall refer to the river's course at this time as the 1919 channel. In 1920, the Palo Verde Mutual Water Company, with the authorization of the United States Department of the Interior, constructed a cut-off channel across the neck of this bend. Appendix E shows the location of the cut-off as proposed. By 1921, the entire river had moved into this cut-off channel, described as the Olive Lake Cut, and was following a course to the east of both the 1908 channel and the westerly, 1919 channel. We shall refer to this last course as the 1921 channel. The record contains no drawing of the 1921 channel

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

although Appendix F fixes the channel as of April 1925 somewhat east of the present course of the river. Obviously the 1921 channel was also east of the present river.[1]

Uncertainty over the shifting state border led California and Arizona to fix the line in a Boundary Pact which was approved by Congress in 1966. Act of Aug. 11, 1966, Pub.L. No. 89–531, 80 Stat. 340. The Pact did not affect property claims or titles, and the states' ratifying statutes provided that titles, rights, or claims would not be prejudiced by the Pact's designation of the state boundary line. 1963 Ariz.Sess. Laws ch. 77, § 5, reprinted in annotation to Ariz.Rev.Stat.Ann. § 41–522 (West 1974); 1963 Cal.Stats. ch. 859, § 4, reprinted in annotation to Cal. Gov't Code § 175 (West 1980).

On July 17, 1972, the United States in its capacity as trustee for the Indians commenced this action seeking to quiet title to those lands situated on the California side of the present channel and east of the median line of the 1919 channel. Various individuals and corporations, as well as the Palo Verde Irrigation District and the State of California, were named as defendants. The private defendants had acquired lands in the Olive Lake region, apparently from previous occupants, some years after the construction of the Olive Lake Cut but before the adoption of the Arizona-California Boundary Pact. The Palo Verde Irrigation District, a public district of the State of California, claims lands in the Olive Lake region and regulates water usage in the vicinity. The Indians contended, however, that the Colorado River Indian Reservation extended to the median line of the 1919 channel and that, because the Olive Lake Cut had effected an avulsive change in the course of the river, their title to this land was never lost. They therefore asked that the defendants be required to remove themselves and their personal belongings from the land and to pay damages for wrongful possession.

At trial, the dispute focused on the issue of whether the change in the river's course from the 1919 channel to the 1921 channel was the result of avulsion or accretion. The district court found that the change had been avulsive and concluded that title to the lands had remained in the Indians. The district court also found that the Reservation included the eastern half of the bed of the river. Thus, the court held that the Indians presently hold title to the lands east of the median line of the 1919 channel, and that the State of California owns the bed west of that median line. The court also ordered the defendants, except the State of California, to pay damages for wrongful possession.

Although the district court announced its decision on November 17, 1976, the court's findings of fact, conclusions of law, and judgment were not filed until February 11, 1977. In the intervening period, the Supreme Court rendered its decision in *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), in which the Court overruled its previous decision in *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973). Arguing that the district court had relied on federal law and that under *Corvallis* the case should be resolved under state rather than federal law, the defendants, except the State of California, moved for a new trial. The motion was denied, and defendants, again save for the State of California, appealed.

Appellants raise two issues. They contend that the property dispute is governed by California law, not federal law. Under California law, in appellants' view, the Indians would not have obtained title to any accretions which were artificially caused. Hence, appellants request a new trial in order to prove that the lands in question were deposited on the Arizona side of the river as a result of artificial accretions caused by the construction of the Laguna Dam in 1909. Appellants also contend that

1. The course of the river now appears to be somewhat to the west of the Olive Lake Cut. In resolving the issues of this case, however, we need not consider changes occurring after 1921.

the Indian Reservation did not include the eastern half of the riverbed and that the district court's determination of the Reservation's western boundary was thus incorrect. We shall address these issues separately.

## II.

In *Bonelli Cattle Co. v. Arizona, supra,* the Supreme Court held that a dispute between a private claimant and the State of Arizona over title to land within the abandoned bed of the Colorado River was governed by federal law. Consistent with *Bonelli,* the district court decided this case on the basis of federal law. The overruling of *Bonelli* by *Corvallis* enables the appellants to argue that this case must be decided according to state, not federal law, and that the district court should thus have granted their motion for a new trial. The appellee contends that *Corvallis* is inapplicable here because, unlike the Willamette River, which was the source of the controversy in *Corvallis,* the Colorado River until 1966 formed the boundary between two states.

■ We believe this dispute concerning the proper application of *Corvallis* was resolved by the Supreme Court's recent decision in *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). The claimant in *Wilson* was a tribe of Indians whose reservation, located in Nebraska, was bounded on the east by the Missouri River. Prior to a compact made in 1943, the river had also marked the state boundary between Nebraska and Iowa.

The tribe claimed lands that had once been part of the reservation but which, due to changes in the river's course, had passed to the Iowa side of the river. The Supreme Court held that the Indians' claim was governed by federal law but that state law should be adopted as the rule of decision. *Id.* at 669–76, 99 S.Ct. at 2538–42. This holding governs this case. It follows that the substantive rule of decision in this case with respect to issues arising from changes in the course of the Colorado River must be ascertained by incorporating state law to give content to the federal law which controls this controversy.[2] This conclusion, however, does not require reversal of the judgment of the district court if its application leads to no different result. A proper judgment, though based on the wrong grounds, should nonetheless be affirmed. *United States. v. Best,* 573 F.2d 1095, 1100–01 (9th Cir.1978).

■ To ascertain whether state law would alter the result reached below we must determine which state's law should provide the rule of decision. The appellants assert that California law governs, while the appellee maintains that, assuming state law is to be employed, it must be that of Arizona. We agree with the appellants. The land in dispute presently is within the State of California. That is controlling unless the Arizona-California Boundary Pact dictates a different conclusion. The Pact itself dictates no choice as to what law shall govern disputes over land titles. However, in ratifying the Pact, each state adopted a

2. Our conclusion that this controversy should be decided in accordance with state law is not inconsistent with our recent decision in *United States v. Montana,* 604 F.2d 1162, 1173–74 (9th Cir.1979), *rev'd on other grounds,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (not involving choice of law), in which we reaffirmed our earlier ruling in *United States v. Finch,* 548 F.2d 822 (9th Cir.1976), *vacated on other grounds,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977), and declined to apply Montana law in determining the title of the Crow Tribe to the bed and banks of the Big Horn River. In *Finch* and *Montana,* the question was whether the treaties creating the Crow Reservation had conferred title to the riverbed on the Indians, thus precluding Mon-tana from acquiring title to the bed upon its admission to the Union. The case did not raise any issue involving subsequent changes in title or deviations in the river's course. Hence, our inquiry began and ended with the construction of the Crow Indian Treaties as applied to a river within the Crow Reservation. This was purely a matter of federal law. In this case, similarly, we must apply federal law to decide whether the statute and executive orders which established the Reservation conveyed to the Indians the title to the riverbed. In determining the effect of subsequent changes in the river's course, however, *Wilson* requires that state law serve as the rule of decision. *Cf. Corvallis, supra,* 429 U.S. at 371, 377, 97 S.Ct. at 587, 590.

"preservation of rights" provision, which declared:

> Nothing contained in the provisions of this act ... shall prejudice the titles, rights or claims of any person, public or private, natural or artificial, to any of the lands herein involved whether such titles, rights, or claims arise or exist upon the basis that the lands affected by the designation of boundary as set forth in the compact and in this act were previously a part of the State of Arizona and have now become a part of the State of California, or were previously a part of the State of California and have now become a part of the State of Arizona or otherwise; ...

1963 Ariz.Sess.Laws ch. 77, § 5, reprinted in annotation to Ariz.Rev.Stat.Ann. § 41–522 (West 1974); 1963 Cal.Stats. ch. 859, § 4, reprinted in annotation to Cal.Gov't Code § 175 (West 1980). This provision, as we read it, alters the normal assumption that property located in California is subject to California law only if the lands in dispute were part of Arizona before the adoption of the Pact and if the Indians' claims would be prejudiced by the application of California law. Neither condition exists, however.

The record, as demonstrated by Appendix F, supports appellants' contention that these lands were part of California, not Arizona, before the adoption of the Pact. Appellants, who claim title under the laws of California, have been in possession of the land since well before the Pact; indeed, their possession of the lands is not only conceded but is the basis of the claim for damages against them. In addition, one of the appellants, the Palo Verde Irrigation District, is a public district organized under the laws of California. The District, which was created by statute in 1923, Cal. Water Code App. § 33–2 (West 1968), has authority over water usage in the Palo Verde Valley; the District is empowered to levy taxes for this purpose, id. § 33–28, and holds liens for unpaid taxes and water tolls on the lands in issue, id. § 33–28f. See Clerk's Record, vol. I., at 26. In view of these facts, it is clear that the area was within the jurisdiction of California prior to adoption of the Boundary Pact.[3]

Moreover, the claim of the Indians is not prejudiced by application of California law. Although Arizona case law relevant to this issue is scant, the leading case, State v. Bonelli Cattle Co., 107 Ariz. 465, 469, 489 P.2d 699 (1972), rev'd on other grounds, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), cites the California law on artificial accretion with approval. Because our resolution of the relevant issue employs the same law, it is unlikely that application of Arizona law would alter our result. Thus, our choice of law does not prejudice the Indians.

Having concluded that the law of California should be adopted as the federal rule of decision in this case, we now must decide whether a new trial is necessary. Our approach is first to review the content of the applicable federal common law, then to examine California law to determine whether it differs and, if so, whether that difference requires a new trial.

In examining California law, we shall be mindful that California courts are required by statute to follow common law rules unless those rules conflict with state law or the federal constitution. Cal.Civ.Code § 22.2 (West 1954).

Under the federal and common law rule, land formed by a process of accretion, or gradual deposition of soil upon the shore of an upland bounded by water, belongs to the upland owner. Hence, if a river forming the boundary between the property of two upland owners changes its

**3.** In arguing that these lands were part of Arizona, the Indians may be suggesting that before the Pact, Arizona was rightfully entitled to these lands even though California in fact exercised jurisdiction over them. We do not believe, however, that the Boundary Pact or the ratifying statutes require us to determine whether Arizona could rightfully have claimed sovereignty over these lands, since the Pact was adopted precisely for the purpose of foreclosing such controversies. Cf. Nebraska v. Iowa, 406 U.S. 117, 122–23, 92 S.Ct. 1379, 1381–83, 31 L.Ed.2d 733 (1972). The Indians are not entitled to make for Arizona a claim which Arizona has relinquished.

course by a gradual process of erosion from one bank and accretion to the other, the boundary moves with the river. However, sudden or "avulsive" changes in a river's course do not alter the boundaries, which remain in the abandoned riverbed. *See County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874); 5A *Thompson on Real Property* §§ 2560, 2561 (repl. 1978).

The district court in this case applied federal law and concluded that as the Colorado River moved slowly westward between 1909 and 1920, the western boundary of the Reservation moved with it. However, the Olive Lake Cut, which diverted the river eastward to its 1921 channel, effected an avulsive change and thus left the Reservation's boundary unaltered. The boundary thus remained at the abandoned westerly channel. Appellants do not deny that the district court's judgment is correct as a matter of federal law. As indicated above, the common law does not differ.

California courts have expressed approval of the common law doctrine of accretion. *See, e.g., Forgeus v. County of Santa Cruz,* 24 Cal.App. 193, 199–200, 140 P. 1092 (1914). However, certain California cases have created a limited exception to the common law rules by distinguishing between accretion which is naturally caused and accretion which results from artificial causes, such as man-made dams or other structures which may obstruct the natural movements of a body of water. It is this exception to which appellants pin their hopes. They maintain that these cases establish a "last natural channel" rule under which artificially caused accretion leaves property boundaries unchanged. A new trial is necessary, they assert, to enable them to prove that the river's westward movement before 1920 was artificially caused by the construction of the Laguna Dam in 1909. From this it would follow, the appellants continue, that the western boundary of the Reservation should thus be determined not by the river's westerly, 1919 channel, as the district court held, but rather by the 1908 channel which the river followed before the closure of the dam.

■ We do not believe that California courts would apply the "last natural channel" rule to the facts of this case. The State of California so asserts in an *amicus curiae* brief which points out that California's exception for artificial accretions applies only to state sovereign lands. Our review of the California decisions from which the artificial accretion exception is derived convinces us that the State of California's position is correct. California courts have consistently viewed the exception as a doctrine designed to protect state sovereign lands. Thus, in *Carpenter v. City of Santa Monica,* 63 Cal.App.2d 772, 787, 147 P.2d 964 (1944), the court stated:

> There are no doubt many federal cases, following the leading case of *County of St. Clair v. Lovingston,* 23 Wall. (90 U.S.) 46 [23 L.Ed. 59], relied upon by appellant, which hold that as between competing upland owners, or as between upland owners and others not claiming tidelands as successors of the state, artificial accretions belong to the upland owner. This is the general common law rule and probably the rule in this state. (*Forgeus v. County of Santa Cruz,* 24 Cal.App. 193 [140 P. 1092].) An entirely different rule may apply, however, where the upland owner attempts to assert title to lands formed by artificial accretions against the claim of the state, or its successor in interest, that such lands are tidelands . . . .
>
> When the California cases are considered there can be no reasonable doubt but that the rule in this state is that in a controversy between the state, or its grantees, and the upland owner, artificial accretions belong to the state . . . .

Later, in *People v. Hecker,* 179 Cal.App.2d 823, 837, 4 Cal.Rptr. 334 (1960), the court declared:

> Relying upon the federal and common-law rule that accretion accrues to the upland owner even though assisted by artificial means, appellant submits that under section 22.2, Civil Code, it shall be the rule of decision in California courts.

The law of this state does not support such a position. *The within controversy is between the littoral owner and the state, and as such the rule urged by appellant does not apply.* (Emphasis added.) These pronouncements indicate that the artificial accretion doctrine is a narrow exception intended only to protect the state's title to its sovereign lands.[4]

This interpretation is consistent with the reasons which underlie the artificial accretion exception. Although the purposes of the exception are admittedly obscure, two reasons for distinguishing between natural and artificial accretion are discernible. The first is reflected by the earliest case to distinguish between artificial and natural accretion, *Dana v. Jackson Street Wharf Co.,* 31 Cal. 118 (1866), which emphasized that since upland owners have no right to create obstructions to the natural flow of waterways, such obstructions therefore are within the control of the state. "By the common law any erection below high water mark, without license, is regarded as an encroachment and intrusion on the King's soil, which the King may demolish, seize or arrent at his pleasure." *Id.* at 120. The court then appears to have reasoned that since an artificial obstruction in the body of water is in a sense within the state's control, the state may also claim any accretion caused by such an obstruction. Thus, in *Forgeus v. County of Santa Cruz, supra,* 24 Cal.App. at 200, 140 P. 1092, after upholding the claim of an upland owner to accretions allegedly caused by the construction on the owner's land of a county roadway, the court added: "Clearly, there is a distinction between this case and that where a structure is erected, by the state or municipality, on land below the line of ordinary high water. In the latter case the deposit of alluvion caused by such structure would

not inure to the benefit of the riparian owner."

A more important reason for the artificial accretion exception was also suggested in *Dana.* The court, observing ٬that the boundaries of the San Francisco waterfront upon which the plaintiff's property was situated were statutorily defined, concluded that to permit a landowner to acquire artificial accretions would alter waterfront boundaries in contravention of that statute. *Dana, supra,* 31 Cal. at 121. Similarly, cases which have denied the claims of upland owners to land formed by artificially caused deposits upon a seashore appear to be based on a provision of the California Constitution which forbids alienation of tidelands located within two miles of an incorporated city or town. Cal. Const. art. 15, § 3 (repealed 1976; current version at art. 10, § 3). Thus, in *Patton v. City of Los Angeles,* 169 Cal. 521, 525, 147 P. 141 (1915), the California Supreme Court declared that tideland which had been filled in by accretion

> was once tideland, and ... this being so, it was reserved from sale, and was not alienable by any state officer under any law, ... and, therefore, no artificial embankment, made by third persons, or made or suffered by state officers or agents, nor any accretion to the adjacent upland caused thereby, could operate to divest the state of its title to the tide land so reserved.

The court did not explain why its reasoning would not be equally applicable to instances of natural accretion. Possibly it is because artificial accretion more resembles the intentional alienation of state lands, which the California Constitution forbids, than does the process of natural accretion. In any event, nearly all the artificial accretion cases involved tidelands.

---

4. It is true that in *City of Long Beach v. Mansell,* 3 Cal.3d 462, 469 n. 4, 91 Cal.Rptr. 23, 476 P.2d 423 (1970), the California Supreme Court referred to the artificial accretion exception without stating that the exception applied only to state sovereign lands. This statement occurred in a footnote as part of a two sentence summary of the rules governing accretion and avulsion. The footnote was only peripherally related to the issues in the case. Nothing in the footnote suggested, and we think it unlikely, that the court intended by this cursory description of the law to alter the rules governing accretion as more fully explained in earlier decisions.

■ Hence, we conclude that California's artificial accretion exception appears to be based, first, on the state's control over obstructions erected in waterways and, second, on the statutory or constitutional inalienability of particular state lands, especially tidelands. It was created to protect the sovereign lands of the state. This purpose indicates that the exception need not be extended to private landowners. Support for this view is provided by the fact that the exception has never been applied directly to benefit a landowner other than the state or its assignee.

The case most helpful to appellants is *People ex rel. Department of Public Works v. Shasta Pipe & Supply Co.,* 264 Cal.App.2d 520, 70 Cal.Rptr. 618 (1968). The controversy in that case was caused by the movement of the Feather River, which in the disputed area ran from east to west. Because of mining and dredging operations, the river's course had moved southward in the century before 1960, and when the state acted in 1961 to condemn lands in the area, the owner of the land to the north of the original channel claimed title to the lands lying between the old and new channels under the doctrines of accretion, adverse possession, and occupancy. After this claim was rejected in the superior court, the court of appeals remanded for trial on the issues of adverse possession and occupancy but apparently agreed that the landowner could not claim the lands in question on the basis of accretion. Though the opinion discusses the accretion doctrine only briefly, the court seems to have reasoned that because the change in the river's course was caused by human interference, the state had retained title to the original bed rather than acquiring title to the new bed. *Id.* at 535, 70 Cal.Rptr. 618. The property of the upland owner on the north, therefore, could not be extended southward by accretion because it was blocked on the south by a strip of land, the river's abandoned bed, which belonged to the state. As a consequence, perhaps the owner of land lying south of the original bed was an incidental beneficiary of the artificial accretion doctrine. By preserving the state's title to the abandoned bed, owners south of the original bed may have had their property preserved against an accretion loss.

■ Using this reasoning, appellants argue that if the westward movement of the Colorado River prior to construction of the Olive Lake Cut was caused by the erection of the Laguna Dam in 1909, then California retained title to the 1908 channel with the result that the Reservation could not expand westward. The difficulty that the appellants encounter is that California has not claimed title to the 1908 bed. Rather, it has claimed the westerly half of the abandoned course followed by the river before the Olive Lake Cut was made in 1920. Moreover, this claim has been approved by the district court.[5] California has not appealed from the district court's judgment; it is res judicata and unreviewable by us. *International Manufacturing Co. v. Landon,*

5.  There has been some uncertainty over which bed was awarded to the State of California in the proceedings below. At oral argument, counsel for the United States, representing the Indians, admitted that he did not know which bed the state had received in the judgment. In a Supplemental Memorandum, appellants declare that the State of California was awarded the bed west of "the midstream of the Colorado River *prior to its avulsive change....*" (emphasis added), thus referring to the 1919 channel; later in the same memorandum, however, appellants suggest that California owns the western half of the 1908 riverbed. Because of this confusion, we quote findings 14 and 15 from the district court's findings of fact:

14.  With respect to the lands shown on said Exhibit 9, as lying between the Colorado River as shown on Exhibit 9 and the median line as shown and described on Exhibit 9 [the median line of the westerly, 1919 bed is indicated on Exhibit 9], said lands, comprising about 1912 acres, are owned by the United States of America in trust for the benefit of the Colorado River Tribes. No part of said lands have ever been disposed of by the United States of America by patent or otherwise.

15.  All that part of the abandoned bed of the Colorado River lying westerly of the median line described on Exhibit 9, as of the time the river commenced flowing through the cut-off constructed by the Palo Verde Mutual Water Co. is owned by the State of California.

*Inc.,* 327 F.2d 824 (9th Cir.1964). Hence, appellants cannot assert that their property boundaries were fixed by a protective barrier of state land.[6]

We conclude that appellants cannot invoke California's artificial accretion exception. It follows that the California rule of decision would thus be identical to the federal law doctrine applied by the district court. Therefore, the change in applicable law effected by the Supreme Court's decisions in *Corvallis* and *Wilson* would not alter the outcome in this case.

## III.

TRASK, Circuit Judge:

Appellants challenge the district court's determination that the executive orders which established the Reservation conveyed to the Indians title to the easterly half of the bed of the Colorado River, and, therefore, title to lands east of the median line of the abandoned westerly channel. Here, as in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), "the question is whether the United States intended to convey title to the riverbed to [the Indians]." *Id.* at 633, 90 S.Ct. at 1335. Although an opinion was filed in this case on March 30, 1981, the panel withdrew its disposition in April, 1981, for reconsideration in view of *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1980).

In *Montana v. United States,* the Supreme Court reaffirmed the presumption against conveyances by the United States

of lands beneath navigable waters during a state's territorial period: "As a general principle, the Federal Government holds such lands in trust for future States, to be granted to such States when they enter the Union and assume sovereignty on an 'equal footing' with the established States." *Id.* at 551, 101 S.Ct. at 1251. *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 222–23, 229, 11 L.Ed. 565 (1845). In deciding a question of title to land beneath navigable waters the Court stated:

> But because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, *United States v. Oregon, supra,* [295 U.S.], at 14 [55 S.Ct. at 615], it will not be held that the United States has conveyed such land except because of "some international duty or public exigency." *United States v. Holt State Bank,* 270 U.S., at 55 [46 S.Ct. at 199]. See also *Shively v. Bowlby, supra* [152 U.S.], at 48 [14 S.Ct. at 566]. A court deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against conveyance by the United States, *United States v. Oregon, supra* [295 U.S.], at 14 [55 S.Ct. at 615], and must not infer such a conveyance "unless the intention was definitely declared or otherwise made plain," *United States v. Holt State Bank, supra* [270 U.S.], at 55 [46 S.Ct. at 199], or was rendered "in clear and especial words," *Martin v. Waddell, supra* [41 U.S.], at 411, or "unless the claim con-

---

**6.** Although we need not determine whether, but for the judgment below, and assuming that the river's westward movement was artificially-caused, California would rightfully be entitled to the 1908 bed rather than to the westerly bed, we do note that appellants' position on this issue is open to dispute. In the first place, it is not clear whether this issue, which would involve a determination of the boundary between California and Arizona during the period in question, would be governed by state or federal law. Under federal law, as we have observed, appellants' contention that the westward movement of the river was artificially-caused would be irrelevant. But even under state law, the issue is uncertain. To be sure, the court in

*Shasta* indicated that the state retained title to the original riverbed and did not own the new bed after the Feather River changed its course as a result of artificial causes. In that case, however, the court noted that "the state does not claim the bed of the river in its present location." *Shasta, supra,* 264 Cal.App.2d at 535, 70 Cal.Rptr. 618. If, on the other hand, the state were to relinquish its claim to the old bed and assert ownership over the newly formed bed, thus declining to invoke the artificial accretion exception, as the state did in this case, it is not clear that a court applying California law would be required to reach the same result arrived at in *Shasta.*

firmed in terms embraces the land under the waters of the stream," *Packer v. Bird, supra* [137 U.S.] at 672 [11 S.Ct. at 212]. 450 U.S. at 551, 101 S.Ct. at 1251. The Court, however, has recognized that Congress may convey lands underlying navigable waters and defeat the equal footing doctrine if the conveyances were necessary to satisfy international obligations, to promote or facilitate commerce among the States or with foreign nations, or to carry out other appropriate public purposes. *United States v. Holt State Bank,* 270 U.S. 49, 54–55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1925); *Shively v. Bowlby,* 152 U.S. 1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894).

■ The *Montana* decision forecloses any argument that Congress intended to convey lands underlying navigable waters unless an express reference to the bed beneath the waters can be found in the grants establishing the reservation. *See* 450 U.S., at 544, 101 S.Ct. at 1245. For example, an implied conveyance cannot be upheld on the grounds that the navigable water lay wholly within the boundaries of a reservation, *id.* at 552, 101 S.Ct. at 1251; *see United States v. Holt State Bank,* 270 U.S. at 57–58, 46 S.Ct. at 199–200, or that treaties creating the reservation contain a right of exclusive tribal occupancy. *Montana v. United States,* 450 U.S. at 554–55, 101 S.Ct. at 1251–52.

■ Turning to the facts in the present case, even the strongest language in the various official documents defining the reservation's western boundary falls short of

the specificity required by *Montana.* We conceded in our earlier opinion (subsequently withdrawn by the panel for reconsideration in light of *Montana*) that the first executive order issued in 1873 delineating the bounds of the Reservation was ambiguous. It established the western boundary of the Reservation only vaguely as "bounded on the west by the Colorado River." We nevertheless construed the ambiguity in favor of the Tribes—an approach *Montana* rejects.[7] We next examined Order of May 15, 1876, which established the metes and bounds of the Reservation. This order set as part of the western boundary "a direct line toward the place of beginning to the *west* bank of the Colorado River; thence *down said west bank* to a point opposite the place of beginning." (emphasis added). Although the United States did not own the western half of the riverbed in 1876 because it had passed by that time to California under the equal footing doctrine, we found that "it is surely a fair inference that in the uncertain legal-boundary atmosphere of the time the government believed that establishing the boundary at the west bank would operate to convey that portion of the bed to which it still had title." Again, this analysis does not survive *Montana*'s requirement that Congress' intent be expressed in " 'clear and especial words' or 'definitely declared or otherwise made very plain,' . . . ." 450 U.S. at 554, 101 S.Ct. at 1252.

In our discussion of the history and lifestyle of the Tribes, we referred to a Memorial of the Legislature of Arizona, House

---

7. Although the inexact and ambiguous language in the conveyances to the Choctaw and Cherokee Tribes weighed in favor of the Indians in *Choctaw Nation,* similarly vague language in the Crow treaties was deemed insufficient in *Montana.* As Justice Stevens indicates in his concurring opinion in *Montana,* the Court's reliance in *Choctaw Nation* on the rule of construction favoring the tribes arguably could be read as an indication that the equal footing presumption against disposition by the United States of land under navigable waters did not apply to Indian reservations. *Montana v. United States,* 450 U.S. at 567–68, 101 S.Ct. at 1265–66. This was precisely the conclusion

we reached in our first disposition of this case. Although Justice Stevens joins the *Montana* majority in holding that *United States v. Holt State Bank* states the rule with *Choctaw Nation* as the exception, it is noteworthy that his concurrence recognizes that the exact opposite conclusion was not unreasonable. The debate concerning the logic of the *Montana* decision undoubtedly will continue for some time. Nevertheless, the Supreme Court has spoken. *See* Barsh and Henderson, *Contrary Jurisprudence; Tribal Interests in Navigable Waterways Before and After Montana v. United States,* 56 Wash.L.Rev. 627 (1981).

Misc.Doc. No. 16, 38th Cong., 2d Sess. (1865); Cong.Globe, 38th Cong., 2d Sess. 1320 (a resolution passed by the Arizona Territorial Legislature which was later presented to Congress). The resolution states in part: "[T]he late superintendent of Indian affairs of the Territory, honorable Charles D. Poston, in view of the [Tribes'] scattered and destitute condition, selected and caused to be laid off, *on the east bank and bottom of the colorado river* a reservation . . . ." (emphasis added). Although we interpreted this language to show that the Territorial Legislature understood the Reservation to include the riverbed, other references in the report made by Charles Poston suggest that the word "bottom" may simply refer to the lowlands that lie alongside the river rather than the riverbed itself. For example, in his statement before Congress, Representative Poston explained that the Tribes "cultivate the bottom lands of the Colorado River where an overflow affords sufficient moisture; the failure of an overflow, which sometimes happens, is considered a great calamity, and breeds a famine." *Id.* Another report of the Tribes' agriculture describes a "fine wide bottom, in which last year, were the cultivated fields of the Indians." House Ex.Doc. 76, 34th Cong., 3d Sess. 34, 37 (1857) (letter of Capt. S.P. Heintzelman); Cong.Globe, *supra,* at 1320. This reference to growing crops in the river bottom suggests that the riverbed itself is not what the term "bottom" described.

Reaching the conclusion that the documents establishing the reservation did not convey the riverbed does not end our analysis under *Montana.* The establishment of an Indian reservation can be an "appropriate public purpose" justifying congressional conveyance of a riverbed if sufficient "public exigency" existed to prompt Congress to depart from the equal footing doctrine. 450 U.S. at 556, 101 S.Ct. at 1253; *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1919); *Skokomish Indian Tribe v. France,* 320 F.2d 205, 212 (9th Cir.1963).

Significantly, the Court in *Montana* did not overrule its earlier decision in *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918), in which the Court construed that an Indian reservation established as "the body of lands known as the Annette Islands" included the adjacent waters and submerged lands as well as the upland islands. *Id.* at 89, 39 S.Ct. at 41–42. The facts in *Alaska Pacific Fisheries,* are instructive. In that case, a commercial fishing operation had erected a large fish-trap offshore near the island on which the Indians had settled. The Court indicated that the trap would catch about 600,000 salmon a season which would substantially reduce the natural supply of fish accessible to the Indians. 248 U.S. at 87, 39 S.Ct. at 41. The use of the adjacent fishing grounds was found to be essential to the Indian's survival. Based on its finding that the Indians of the reservation could not have sustained themselves on the upland areas alone, the Court concluded that Congress intended to convey the lands beneath navigable waters as part of the reservation. In its *Montana* decision, the Court indicated that the lifestyle of the Crow Tribe was unlike that of the Indians in *Alaska Pacific Fisheries:*

> [e]ven though the establishment of an Indian reservation can be an 'appropriate public purpose' within the meaning of *Shively v. Bowlby,* 152 U.S., at 48 [14 S.Ct. at 566], justifying a congressional conveyance of a riverbed, *see, e.g., Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 85 [39 S.Ct. 40, 63 L.Ed. 138], the situation of the Crow Indians at the time of the treaties presented no 'public exigency' which would have required Congress to depart from its policy of reserving ownership of beds under navigable water for the future States. *See Shively v. Bowlby, supra* [152 U.S.], at 48 [14 S.Ct. at 566]. *As the record in this case shows, at the time of the treaty the Crows were a nomadic tribe dependent chiefly on buffalo, and fishing was not important to their diet or way of life.*

*Montana v. United States,* 450 U.S. at 556, 101 S.Ct. at 1253.

▆▆▆ Thus, we conclude that the Supreme Court's decision in *Montana* permits a court to infer congressional intent to convey the bed beneath navigable waters if the Indians can prove they depended heavily on the particular body of water. *See Puyallup Tribe of Indians v. Port of Tacoma,* 525 F.Supp. 65 (W.D.Wash.1981).

Unlike *Alaska Pacific Fisheries,* the Tribes' history and lifestyle in this case do not provide grounds for an exception to the equal footing doctrine. The record does not reflect that the Indians were so dependent on the river that Congress would have intended to depart from the equal footing doctrine and convey the river bed. The Tribes have submitted considerable scholarly documentation to support a finding that a "public exigency" existed to justify a grant of the riverbed. We find this authority unpersuasive.

The issue of aboriginal title was presented to this court on rehearing. Unfortunately the record from the district court does not allow us to make a determination on this issue. However, we do feel the issue is of sufficient import to allow the parties to address it on remand.

## IV.

▆▆▆ Although it is true that conveyances by the United States during a state's territorial period are not lightly to be inferred, *United States v. Holt State Bank,* 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926), it is nevertheless within the power of the United States to make such conveyances if it so desires, *Shively v. Bowlby,* 152 U.S. 1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894). We find the evidence in this case insufficient to enable us to conclude that the government intended to convey the eastern half of the riverbed to the Indians when it formed the Reservation. Accordingly, we hold that the eastern half of the river bed was not conveyed by the government to the Indians as part of the Reservation.

The judgment of the district court is affirmed in part, reversed in part and remanded. On remand the district court should determine the issue of aboriginal title and the correct boundary of the Reservation.

## APPENDIX A
Channel of the Colorado River

in 1908

## APPENDIX B
Channel of the Colorado River

in 1915

# APPENDIX C

Channel of the Colorado River

in 1919

## APPENDIX D
Channel of the Colorado River

in 1919–1920

# APPENDIX E

Proposed Location

of Olive Lake Cut, 1920

## APPENDIX F.
Channel of the Colorado River

in 1925