[No. S037729. Aug. 31, 1995.]

THE STATE OF CALIFORNIA ex rel. STATE LANDS COMMISSION, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
RICHARD K. LOVELACE et al., Real Parties in Interest.

54

## COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Richard M. Frank, Dennis M. Eagan, Joseph Barbieri, Kenneth R. Williams and Michael L. Crow, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

McDonough, Holland & Allen, Stuart Somach, Virginia A. Cahill and Sandra K. Dunn for Real Parties in Interest.

Washburn, Briscoe & McCarthy, Edgar B. Washburn, Sean E. McCarthy, David M. Ivester, Louis F. Claiborne and Lyn Jacobs for Real Parties in Interest and as Amici Curiae on behalf of Real Parties in Interest.

Zumbrun, Best & Findley, Ronald A. Zumbrun, Robert K. Best, R. Prescott Jaunich and James S. Burling as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

ARABIAN, J.—Beginning in 1848, and accelerating rapidly in 1849, gold lured fortune seekers to California. Hordes of prospectors panning or using other primitive methods quickly snatched up the wealth lying on the surface and in riverbeds. Soon, more advanced and environmentally intrusive techniques were utilized to reach the more inaccessible treasure hiding within the California hills. The era of hydraulic mining began. Miners washed the land away with water, extracting gold in the process.

Before being halted over 100 years ago, hydraulic mining caused enormous quantities of silt and other debris to be deposited into water systems, including the Sacramento River and its tributaries. This silt and debris then flowed downstream. Some came to rest along river banks far from the locale of the mining, changing forever the landscape of California. These events,

and possibly human activities such as river dredging and the construction of wing dams and levees, contributed over many years to the imperceptible accumulation, or "accretion," of 12 acres of dry land that used to be riverbed in a spot in Sacramento called Chicory Bend. The Sacramento River there is navigable and, even that far inland, is affected by the tides, making its shores tidelands. The river and tidelands belong to the state, as did the 12 acres when they were riverbed. The adjacent land, at least that not including the 12 acres, belongs to private parties. The question we address is who owns the 12 acres now.

We trace the underlying factual history to the 19th century, but the relevant law dates back to the time of the Byzantine Emperor Justinian, who gave the world the Justinian Code, and the first known law of accretion. The general California rule is easy to state. If the accretion was *natural*, the private landowners own it; if it was *artificial*, the state owns it. But the specific application is far from easy. Is the accretion natural any time it is caused by the flow of the river, as the majority below found? Or is it artificial if caused by the hydraulic mining and by other human activities nearer the accreted land, as the state contends?

We conclude, as did the concurring justice of the Court of Appeal, that to adopt the test of the majority would effectively abandon California's long-standing "artificial accretion" rule. Instead, we reaffirm that rule. As between the state and private upland owners, land along tidelands and navigable rivers that accretes by artificial means, such as local dredging and construction of wing dams and levees, remains in state ownership, and does not go to the upland owner. We also conclude, however, that we should narrowly construe what is artificial under the California rule. Accretion is artificial if directly caused by human activities in the immediate vicinity of the accreted land. But accretion is not artificial merely because human activities far away and, in the case of hydraulic mining, long ago contributed to it.

We thus disagree with much of the analysis of the majority below. However, we agree with its result, which is to deny a petition for writ of mandate. Accordingly, we affirm the judgment of the Court of Appeal while rejecting the basis upon which it reached that judgment.

## I. PROCEDURAL HISTORY

### A. *Proceedings in Superior Court*

Real parties in interest, Richard K. Lovelace et al. (hereafter private landowners or, simply, landowners), own property along the Sacramento

River in Sacramento. In the underlying action in superior court to quiet title, the landowners and petitioner, the State of California ex rel. State Lands Commission (hereafter the state), both claim ownership of a 12-acre parcel between the river and the landowners' property on the west end of Seamas Avenue at a place commonly called Chicory Bend. The landowners claim title to the property to the high-tide line of the river under a deed received from their predecessor in interest.

The state claims ownership under the following theory. In 1850, when California became a state, the disputed property was under water and part of the bed of the Sacramento River. Because the river there is navigable and tidal, the state acquired ownership of the riverbed upon admission to the Union. Thereafter, the course of the river shifted westward as the result of "artificial accretive influences," creating the disputed acreage. Because the accretion was artificial, the state contends, it retains ownership of the property. In response to an interrogatory propounded by the private land-owners, the state listed four artificial influences it claims caused the accretion: (1) "Debris from hydraulic mining activities in the American River and Feather River watersheds," (2) "Wing dams erected in the river channel at or near the location of the subject property," (3) "Levees constructed at or near the location of the subject property," and (4) "Dredging of the river channel in the vicinity of the subject property."

The landowners moved under Code of Civil Procedure section 437c as it then read (it has since been amended) for summary adjudication that "any gradual accumulations of land along the Sacramento River at Chicory Bend consisting, in part, of sediments washed into upstream tributaries in the Feather River and American River watersheds by hydraulic mining, and not caused by any artificial structures or activities at Chicory Bend, are natural accretions that belong to the riparian landowner." They expressly did not seek summary adjudication regarding the wing dams, levees, and dredging. Although disputing that these latter activities contributed to the accretion, they recognized that this presented a factual question not susceptible of summary adjudication, and conceded "that any deposits of land caused by these three activities, in the vicinity of Chicory Bend, would be artificial accretions under California law."

The parties agree that the Feather River and the American River empty into the Sacramento River north of Chicory Bend. The landowners' statement of undisputed material facts alleged: "During an approximately 25-year period prior to 1884, hydraulic mining operations in the American River and Feather River watersheds washed great quantities of earth into natural

streams and watercourses tributary to the American River and Feather River. Some of the mud and silt, in combination with materials that entered the streams as the product of natural erosion, were transported as suspended sediments and eventually deposited in the bed of the Sacramento River."

The state disputed this statement to the extent that it "grossly understates the effect of hydraulic mining debris on the Sacramento River," and alleged: "The hydraulic mining occurred over a 32-year period between 1852 and 1884. Its effects lasted much longer. It had the effect of quintupling for about 100 years the average annual amounts of sediment that would have passed from the Sacramento Basin into the bay under natural conditions. Prior to hydraulic mining, the Sacramento River in the vicinity of Chicory Bend was clear and deep flowing, without islands or bars. The river supported navigation by large steamers and seagoing craft. The hydraulic mining debris had enormous [effects] on the Sacramento River in the vicinity of Chicory Bend. Shoals and sand bars emerged, blocking or hindering navigation. At Chicory Bend, the bed of the river rose 12 to 15 feet between 1872 and 1882. Levees, wing dams and dredging were direct responses to the problems of flooding and hindrance of navigation caused by hydraulic mining debris."

The superior court granted the motion for summary adjudication, ruling: "Civil Code § 1014 provides that accretions from natural causes belong to the adjacent landowner. While there can be no doubt that enormous quantities of silt found their way into the Sacramento River system after having been dislodged by hydraulic mining, the materials were transported to Chicory Bend by natural causes, the flow of the River. In many ways, very little remains natural in the strictest sense as to most California rivers. Dams regulate the flow and alter the extent to which banks are eroded, for example. But to consider the entire system an artificial one would be inappropriate. Given the great passage of time since mining dislodged these materials and the distance from the source of the materials, and the time the accretions have existed, it would be unreasonable to interpret § 1014 to require tracing these accretions to their sources. This would place an inappropriate burden on the parties and the courts."

B. *Appellate Proceedings*

The state filed the instant original writ proceeding in the Court of Appeal seeking to have the order granting summary adjudication vacated. That court issued an alternative writ of mandate, and the matter was briefed. The state argued that the challenged order "is contrary to well-established controlling

case authority which recognizes that deposition of materials washed into the water by human activities but deposited by the natural flow of the water constitute artificial accretion belonging to the state." The private landowners defended the trial court order, arguing that accretion is artificial only if "some man-made structure impedes the flow of water causing accumulation of sediment."

The California Land Title Association (CLTA) filed an amicus curiae brief in the Court of Appeal urging a far narrower interpretation of what constitutes artificial accretion. Although professing to be "in general agreement with the position" of the landowners, it did "not agree with them on the point that only accretions resulting from hydraulic mining are to be treated as 'natural,' inuring to the benefit of the upland owners, and that accretions resulting from wing dams, levees and other structures must be viewed as 'artificial' and not attached to the uplands." The CLTA argued that "accretions resulting from any of these activities belong to the uplands, so long as the accretions were deposited gradually and imperceptibly through the action of the river's water."

The majority of the Court of Appeal agreed with the CLTA. In an exhaustive analysis, it found that in most jurisdictions, accreted land belongs to the upland owner whether or not the accretion is artificial, and concluded that California has deviated from this general rule "through a misapplication of judicial precedent." It argued that the decision commonly considered to be the genesis of the California rule, *Dana* v. *Jackson Street Wharf Co.* (1866) 31 Cal. 118, has been misapplied ever since without critical analysis. "It is," the majority stated, "as if the post-*Dana* decisions have artificially accreted themselves on this point."

Based upon its historical review, and "principles of fairness and practical application . . . , recognizing that little in the California landscape or its significant waterways remains in a completely natural state," the majority concluded that "a fair, workable and legally supportable rule of accretion, for both [Civil Code] section 1014 and the tideland context, is that of a gradual and imperceptible accumulation of material that results from the action of the water, even if artificially influenced." Accordingly, it held that "to the extent that the land at Chicory Bend was once tideland but has now been covered by a gradual and imperceptible accumulation of material that has resulted from the action of the waters, even if artificially influenced, that land remains in private ownership—subject to new tideland at the water boundary of the accreted land (at the ordinary high-water mark) that is owned by the state in trust for the public." It therefore denied the state's petition for writ of mandate.

In a concurring and dissenting opinion, Justice Scotland agreed with the result—denying the mandate petition—but disagreed with the majority's analysis. He believed that "[w]hile the statutory construction adopted by the majority is logical, fair and arguably preferable, it does not wash because the majority's effort to avoid California Supreme Court precedent is unconvincing." He urged the rule "that alluvion belongs to the riparian owner except when accretion results from the placement in public waters of a structure or other artificial obstruction which alters the natural flow of the water and causes the gradual and imperceptible accumulation of land proximate to the obstruction. Under California's narrow artificial-accretion exception, it is the artificial nature of the ultimate cause of the accretion, not the artificial nature of the source of the resulting alluvion, which determines whether the alluvion inures to the benefit of the state or the riparian owner. Accordingly, although enormous quantities of debris were deposited artificially into the Sacramento River system after having been dislodged by hydraulic mining, any alluvion resulting from the gradual and imperceptible accumulation of mining debris transported to, and lodged at, Chicory Bend by the flow of the water was formed by 'natural causes' within the meaning of section 1014 assuming the accumulation was not caused by artificial structures placed in the water at Chicory Bend."

Justice Scotland thus agreed with the trial court's ruling, which "simply provides that, assuming any gradual and imperceptible accumulation of land at Chicory Bend consists of hydraulic mining debris carried by river water to that location, and not caused by any artificial obstruction in the water at or near Chicory Bend, it is accretion from 'natural causes' which inures to the benefit of the riparian owner."

We granted the state's petition for review.

## II. DISCUSSION

### A. *The Joint Motion to Dismiss*

■ After we granted review, the parties conditionally settled the case, and filed a "joint motion to dismiss upon stipulation of the parties." The settlement and joint motion were both conditioned upon this court ordering that the Court of Appeal opinion "shall remain unpublished." We issued an order denying the motion "due to the public interest in having the important and continuing legal issues decided." Because the order did not set out in full our reasoning, and cannot serve as precedent in other cases, we believe it appropriate to explain the basis for the order. (See *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 9 [270 Cal.Rptr. 796, 793 P.2d 2].)

In the petition for review, the Attorney General, representing the state, declared that review "is necessary to settle an important question of law affecting a longstanding rule of property designed to protect the public trust title to thousands of acres along the shorelines of California's tide and submerged lands," and that "the respective title interests of the State and thousands of persons owning property bordering on navigable waterways is at stake." "Unless resolved by this Court," the petition stated, "these conflicts and uncertainties present an untenable situation for the State Lands Commission in the carrying out of its statutory mandate to protect and administer the public trust title in California's sovereign tide and submerged lands and navigable waters in an equitable statewide fashion." We granted review partly due to these representations.

The papers submitted to this court with the motion to dismiss did not suggest that the compelling reasons the Attorney General stated for us to resolve the issue had evaporated. The Attorney General did not indicate, for example, that the state was modifying the position that caused it to bring the underlying mandate action in the first place: that accretion caused by 19th century hydraulic mining was artificial. There appeared no reason to believe that similar disputes would not arise in other cases. Indeed, the settlement and motion to dismiss were expressly conditioned on there being *no* precedent-establishing appellate decision in this case, even though there had been one. For these reasons, we denied the motion to dismiss.

In *Lundquist* v. *Reusser* (1994) 7 Cal.4th 1193, 1202, footnote 8 [31 Cal.Rptr.2d 776, 875 P.2d 1279], the case had become moot by settlement before oral argument. We decided it nonetheless, invoking "the well-established line of judicial authority recognizing an exception to the mootness doctrine, and permitting the court to decline to dismiss a case rendered moot by stipulation of the parties where the appeal raises issues of continuing public importance." (*Ibid.*, citing several cases including *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213], and *D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 731-732, fn. 5 [36 Cal.Rptr. 468, 388 P.2d 700] [after we granted hearing, the petitioner made the issue moot by compliance with the challenged court order and then moved to dismiss; motion denied].)

In urging us to grant the motion to dismiss, the Attorney General relied heavily on *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] (*Neary*), where we held that "when the parties to an action agree to settle their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should

grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule." (*Id.* at p. 284.) Nothing in *Neary*, however, is contrary to our refusing to dismiss this case.

As the Court of Appeal recognized in *Lucich* v. *City of Oakland* (1993) 19 Cal.App.4th 494, 500-503 [23 Cal.Rptr.2d 450], *Neary* considered only the factors relevant to whether a stipulated reversal of a *trial court* judgment should be honored. One such consideration was that a trial court judgment does not establish precedent. The factors relevant to whether an appellate judgment should be vacated or an opinion remain or be ordered unpublished pursuant to stipulation were not addressed.

There are two critical differences between the stipulated reversal of a trial judgment in *Neary* and the dismissal motion here. First, in *Neary*, we stressed the efficiency of effectuating settlements and thereby avoiding further litigation. (*Neary, supra,* 3 Cal.4th at pp. 277-278.) As the case proceeds further into the appellate process, however, especially after an appellate decision is actually rendered, more is eradicated by a settlement, and less is gained by the avoidance of further litigation. Second, stipulating that the Court of Appeal opinion not be published and that we not render our own decision would effectively eliminate a precedent-setting appellate decision. As *Neary* itself stressed, " '[T]rial courts make no binding precedents.' " (*Id.* at p. 282.) Published appellate decisions do. The court in *Lucich* v. *City of Oakland, supra,* 19 Cal.App.4th at pages 502-503, correctly recognized that the decisions in which we refused to dismiss the case after we accepted it apply here, not *Neary*.

Moreover, even in cases governed by *Neary*, an appellate court may refuse to accept a stipulated reversal if the refusal would further a "specific, demonstrable, well established, and compelling" public interest. (*Neary, supra,* 3 Cal.4th at p. 283.) Here, either the judgment or the stipulation would bind the state, which is acting as the public's trustee of the land whose ownership is in dispute. Thus, the public interest in the legal issue presented and in the outcome of this case is a compelling reason for our refusal to accept the parties' stipulation.

This is not to say that appellate courts, including this one, do not have discretion to agree to dismiss a case at any stage of the proceeding. Obviously, they do. But, for the reasons stated, we have exercised our discretion in favor of deciding this important legal issue of statewide importance.

## B. *The Merits*

### 1. *Background*[1]

The river at Chicory Bend is both navigable and affected by the tides, making its shores tidelands. The following principles generally apply. The state owns all tidelands below the ordinary high-water mark. (Civ. Code, § 670.) Tidelands within two miles of any incorporated city, such as Sacramento, "shall be withheld from grant or sale to private persons, partnerships, or corporations . . . ." (Cal. Const., art. X, § 3.) The state also owns all land below the water of a navigable lake or stream. (Civ. Code, § 670.) Owners of upland bordering on tidewater take to the ordinary high-water mark. Owners of upland bordering on nontidal navigable water take to the low-water mark. Other upland owners take to the middle of the lake or stream. (Civ. Code, § 830.)

■ Both tidelands and the beds of navigable rivers are owned by the state in trust for the public. (*State of California* v. *Superior Court* (*Lyon*) (1981) 29 Cal.3d 210, 214, 231 [172 Cal.Rptr. 696, 625 P.2d 239]; *People* v. *California Fish Co.* (1913) 166 Cal. 576 [138 P. 79].) The United States Supreme Court has explained that this trust is "for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances . . . for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. . . . The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a

---

[1]The following definitions apply. "Accretion" is the gradual and imperceptible accumulation of land due to the action of a boundary river, stream, lake, pond or tidal waters. "Alluvion" (also called "alluvium") is the material that is accreted and becomes the land. Although the two terms have sometimes been used interchangeably, "accretion" properly refers to the process, and "alluvion" to the substance. Accretion is distinguished from "reliction," the exposing of land by the gradual receding of the water, and "avulsion," a sudden and perceptible change in the location of a body of water. (5A Powell on Real Property (1995) Accretion, § 66.01[1], pp. 66-2 to 66-5; Black's Law Dict. (6th ed. 1990) pp. 20, 77, 137, 1291.) "Tideland" is land between the lines of ordinary high and low tides, covered and uncovered by the ordinary ebb and flow of the tide. (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 518-519, fn. 1 [162 Cal.Rptr. 327, 606 P.2d 362]; Black's Law Dict., *supra*, at p. 1482.)

Because the legal principles of the case might involve either riparian property—that bordering a river—or littoral property—that bordering an ocean, sea or lake—we generally use the broader term "upland" to refer to both types of property or the owner of such property.

transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. . . . The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace." (*Illinois Central Railroad* v. *Illinois* (1892) 146 U.S. 387, 452-453 [36 L.Ed. 1018, 1042-1043, 13 S.Ct. 110]; see also *City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d at p. 521.)

Under this doctrine, the "state holds [tidelands] in trust for the people for their use for commerce, navigation, fishing and other purposes . . . ." (*State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d at p. 214.) More-over, "the same incidents of the trust applicable to tidelands also apply to nontidal navigable waters and that the public's interest is not confined to the water, but extends also to the bed of the water." (*Id.* at p. 231.)

What this means here is that the state owns the land under the Sacramento River and adjacent tidelands to the ordinary line of high tide in trust for the public; the upland private landowners own the landward side of the ordinary line of high tide. The 12 acres in dispute used to be under the river, and thus originally were owned by the state. They are now dry land. Did ownership shift to the upland owners?

The parties agree that the property was created by accretion rather than avulsion, that is, that it formed gradually and imperceptibly over time. A statute enacted in 1872, and unchanged since, concerns accretion along rivers or streams. "Where, *from natural causes,* land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank." (Civ. Code § 1014, italics added.)[2] California has no comparable statute relating to tidelands although, as we will see, there is a substantial body of case law.

---

[2]The rule is different with avulsion. "If a river or stream, navigable or not navigable, carries away, by sudden violence, a considerable and distinguishable part of a bank, and bears it to the opposite bank, or to another part of the same bank, the owner of the part carried away may reclaim it within a year after the owner of the land to which it has been united takes possession thereof." (Civ. Code, § 1015.)

The general rule that accretion belongs to the upland owner is venerable. Over a century ago, the United States Supreme Court, in resolving a dispute over property in Illinois, traced it to the Emperor Justinian: "In the Institutes of Justinian it is said: 'Moreover, the alluvial soil added by a river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase, and that is added by alluvion which is added so gradually that no one can perceive how much is added at any one moment of time.'" (*County of St. Clair* v. *Lovingston* (1874) 90 U.S. (23 Wall.) 46, 66 [23 L.Ed. 59, 63].) The rule is also found in the Code Napoleon. (*Id.* at pp. 66-67 [23 L.Ed. at p. 63].)

Blackstone stated, "the rule of the common law: [¶] 'And as to lands gained from the sea, either by alluvion, by the washing up of land and earth, so as in time to make terra firma, or by dereliction, as when the sea shrinks below the usual water-marks; in these cases the law is held to be that if the gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimis non curat lex*; and besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is, therefore, a reciprocal consideration for such possible charge or loss. But if the alluvion be sudden or considerable, in this case it belongs to the king; for, as the king is lord of the sea, and so owner of the soil while it is covered with water, it is but reasonable he should have the soil when the water has left it dry.'" (*County of St. Clair* v. *Lovingston, supra*, 90 U.S. at p. 67 [23 L.Ed. at p. 63].)

In the common law, as stated by the high court, it did not matter whether the accretion was natural or artificial (unless, possibly, the claimant caused the accretion). "It is insisted . . . that the accretion was caused wholly by obstructions placed in the river above, and that hence the rules upon the subject of alluvion do not apply. If the fact be so, the consequence does not follow. . . . The proximate cause was the deposits made by the water. The law looks no further. Whether the flow of the water was natural or affected by artificial means is immaterial." (*County of St. Clair* v. *Lovingston, supra*, 90 U.S. at p. 66 [23 L.Ed. at p. 63]; see also Annot., Riparian Owner's Right to New Land Created by Reliction or by Accretion Influenced by Artificial Condition Not Produced by Such Owner (1975) 63 A.L.R.3d 249, 255-256 ["[I]t is . . . a widely accepted proposition that the fact that such processes were initiated, accelerated, or otherwise influenced by artificial, manmade structures has no effect on the general rule of accretion and reliction."].)

In California, the law regarding artificial accretion developed quite differently.

## 2. California's Artificial Accretion Rule

The state argues that in California, unlike most jurisdictions, it *does* matter whether accretion is natural or artificial, and that as to tidelands and navigable bodies of water, accretion that is not "from natural causes" but instead is artificial remains in the possession of the state. It further contends that, because "California acquired title to the navigable waterways and tidelands by virtue of her sovereignty when admitted to the Union in 1850" (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 258, fn. 5 [98 Cal.Rptr. 790, 491 P.2d 374]), its own law applies. The private landowners urge the position the CLTA took in the Court of Appeal and adopted by the majority of that court. Resolving this question requires a historical review of the California rule.

The 1866 case of *Dana* v. *Jackson Street Wharf Co., supra,* 31 Cal. 118 (*Dana*), predated by six years the adoption of Civil Code section 1014. There, the landowner owned a waterfront lot in San Francisco. He built a wharf adjacent to the property that caused the disputed land to be "entirely reclaimed from the water," and to become "a permanent accretion by artificial and natural causes" to the lot. (*Id.* at p. 120.) We held that the common law rule that land gained by accretion belongs to the upland owner did not apply because the case was one of "purpresture, or encroachment, by the erection of a wharf in a public harbor, and not a case of marine increase by alluvion . . . ." (*Ibid.*) Moreover, the boundary in question had been fixed by a specific statute, making it permanent, rather than "ever-shifting." (*Id.* at p. 121.)

In 1872, as noted, Civil Code section 1014 was adopted. It was applied in *Fillmore* v. *Jennings* (1889) 78 Cal. 634, 636 [21 P. 536], to land that formed along a river "as the result of natural accretion." Finding that the "case falls exactly within the terms of section 1014 of the Civil Code, which is merely declaratory of the law as it has always been," we held the accreted property belonged to the upland owner. (*Ibid.*) There was no mention of artificial accretion.

Then came an early appellate court decision. (*Forgeus* v. *County of Santa Cruz* (1914) 24 Cal.App. 193 [140 P. 1092].) *Forgeus* has been characterized as "[t]aking the position that where the proximate cause of a deposit of alluvion is gradual accretion caused by a flow of water, the question whether that flow was natural or affected by artificial means is immaterial" (Annot., Riparian Owner's Right to New Land Created by Reliction or by Accretion Influenced by Artificial Condition Not Produced by Such Owner, *supra,* 63 A.L.R.3d at p. 298), but this is not entirely clear. The court held that

accretions due to the county's act in raising a roadbed along a right of way owned by the county over land fronting on Monterey Bay belonged to the upland owner and not the county. "[I]f any accretion or reliction was formed it was not caused by any act of [the private upland owners], but it was due to the act of the county in raising the roadbed along said right of way. It could hardly be contended that the county by such artificial means could secure the fee to the alluvion as an addition to its right of way." (*Forgeus* v. *County of Santa Cruz, supra*, 24 Cal.App. at p. 199.) The *Forgeus* court quoted approvingly the language from *County of St. Clair* v. *Lovingston, supra*, 90 U.S. at page 66 [23 L.Ed. at page 63], that it is immaterial whether the flow of water was natural or artificially affected (24 Cal.App. at p. 199), but also stated: "Clearly, there is a distinction between this case and that where a structure is erected, by the, state or municipality, on land below the line of ordinary high water. In the latter case the deposit of alluvion caused by such structure would not inure to the benefit of the riparian owner." (*Id.* at p. 200, citing *Dana, supra*, 31 Cal. 118.)

A year after *Forgeus*, this court spoke again in *Patton* v. *City of Los Angeles* (1915) 169 Cal. 521 [147 P. 141], a case involving seven acres of land in San Pedro Bay that accreted because of a railroad embankment across part of the bay. We held that the accreted property belonged to the state's successor in interest, the City of Los Angeles, and not the upland owner. Because the property was once tideland, "it was reserved from sale, and was not alienable by any state officer . . . and, therefore, no artificial embankment, made by third persons, or made or suffered by state officers or agents, nor any accretion to the adjacent upland caused thereby, could operate to divest the state of its title to the tide land so reserved. . . . We can see no plausible reason for the contention that the making of such embankments, or accretions caused thereby, would operate in favor of third persons to divest the state of its title to tide lands covered by the embankment and accretions extending out over it from the adjacent upland, and transfer the title to the owner of the upland." (*Id.* at p. 525.)

Another year later came *Strand Improvement Co.* v. *Long Beach* (1916) 173 Cal. 765, 766 [161 P. 975], a dispute over accreted oceanfront property in Long Beach. We confronted the question "whether or not the doctrine that land added to the upland by accretion, or alluvion, applies to land bordering upon the ocean." Relying on the "practically . . . universal rule" as stated by Blackstone (and also citing *County of St. Clair* v. *Lovingston, supra*, 90 U.S. 46), we concluded that the accreted property belongs to the upland owner. (173 Cal. at p. 771.) We rejected the argument that because Civil Code section 1014 expressly covers only rivers and streams, the rule is impliedly

different for property on the ocean, which has no comparable statute. Citing *Dana, supra*, 31 Cal. 118, and other authority, we stated: "The doctrine that the right to alluvion exists in the owner of the seashore, as well as elsewhere, has been recognized in our decisions" (173 Cal. at p. 772), and concluded "that the right of the upland owner to additions to his land by alluvion or accretions exists where the land abuts upon the ocean, and that section 1014 of the Civil Code has no application to alter the common-law rule in that respect." (*Id.* at p. 773.)

*Strand Improvement Co.* v. *Long Beach, supra*, 173 Cal. 765, made no mention of natural or artificial causes, but in *Curtis* v. *Upton* (1917) 175 Cal. 322, 334 [165 P. 935], we described that opinion as deciding "that the common law that gradual accretions *from natural causes* to land abutting upon water belong to the owner of the upland applied to lands fronting upon tidal waters and to the shores of the ocean." (Italics added.)

The next decision involving artificial accretion was *City of Los Angeles* v. *Anderson* (1929) 206 Cal. 662 [275 P. 789]. There, the City of Los Angeles and a private landowner disputed ownership over a triangular-shaped strip of land of less than an acre that had accreted from tidewater because of a breakwater constructed by the federal government in San Pedro Bay. Evidence found credible by the trial court and this court indicated that the accretion was "due entirely to the presence of the breakwater and 'to furnishing material by artificial means . . . , material that was dumped by some contractor over the bluff. . . .'" (*Id.* at p. 665.) We cited the general rule that accreted property belongs to the upland owner, but then stated: "In giving application to this rule, the authorities have consistently declared, in conformity with the common-law acceptation thereof, that, for the owner of the upland to be entitled to the accretions thereto, such accretions must have resulted from natural causes and been of gradual and imperceptible formation. [Citing *Strand Improvement Co.* v. *Long Beach, supra*, 173 Cal. 765; and *Curtis* v. *Upton, supra*, 175 Cal. 322.] Where, however, the accretions have resulted, not from natural causes, but from artificial means, such as the erection of a structure below the line of ordinary high water, there is made out a case of purpresture, or encroachment, and the deposit of alluvion caused by such structure does not inure to the benefit of the littoral or upland owner, but the right to recover possession thereof is in the state or its successor in interest, as the case may be. [Citing *Dana, supra*, 31 Cal. 118; *Forgeus* v. *County of Santa Cruz, supra*, 24 Cal.App. 193; and *Patton* v. *City of Los Angeles, supra*, 169 Cal. 521.]" (206 Cal. at p. 667.)

Because the land at issue did not form "from natural causes and by imperceptible degrees," we concluded in *Anderson*, "but from the deposit

and lodgment of foreign materials, as distinguished from the ordinary wash of the ocean, against the artificial obstruction offered by the government breakwater below the mean high-tide line, such parcel does not attach as alluvion to the ownership of the upland, but retains its character as public land, being in the nature of reclaimed or filled-in tide-land." (*City of Los Angeles* v. *Anderson, supra*, 206 Cal. at p. 667.)

In *Miller* v. *Stockburger* (1938) 12 Cal.2d 440, 444 [85 P.2d 132], we stated that " 'accretions caused by railroad embankments cannot operate to divest the title of the state to its tidelands, or to transfer them to the adjoining littoral owners. And so if tidelands are reclaimed, the change in the character of the land does not have the effect of transferring it to the owners of the abutting upland'. (*Patton* v. *City of Los Angeles*, 169 Cal. 521, 525.)"

*City of Newport Beach* v. *Fager* (1940) 39 Cal.App.2d 23, 26 [102 P.2d 438], involved "reclaimed tide land which was filled in as a result of certain dredging operations carried on by the city between 1918 and 1923." The court held the property did not belong to the upland owner. "All of the evidence relating to the character of the major portion of the land in question shows that it is artificially filled tide land. . . . In order for a littoral owner to be entitled to accretions which may form upon the upland, such accretions must have been the result of natural causes and must have been formed gradually and imperceptibly. (*City of Los Angeles* v. *Anderson*, 206 Cal. 662.) Accretions which have been added to the upland by artificial means do not inure to the benefit of the littoral owner but remain in the state or its successor in interest. (*Dana* v. *Jackson Street Wharf Co.*, 31 Cal. 118 [Am. Dec. 164]; *Patton* v. *City of Los Angeles, supra*.)" (*Id.* at p. 31.)

The land at issue in *Carpenter* v. *City of Santa Monica* (1944) 63 Cal.App.2d 772 [147 P.2d 964] was beach front property that had accreted by artificial means. The private upland owner, "assisted by counsel appearing as amicus curiae on behalf of the California Land Title Association, argue[d] that accretions formed gradually and imperceptibly, whether caused naturally or artificially, belong to the upland owner, as against the state or its grantees." (*Id.* at p. 783.) After reviewing the cases, the court, in an opinion authored by then Presiding Justice Peters, disagreed, finding that "there can be no reasonable doubt but that the rule in this state is that in a controversy between the state, or its grantees, and the upland owner, artificial accretions belong to the state, or its grantees, as the owner of the tidelands." (*Id.* at p. 787.)

The *Carpenter* court distilled the rule "that accretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the

works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state, or its grantee, and do not belong to the upland owner. . . . If accretions along an entire bay caused by the construction of a pier or wharf were held to belong to the upland owners as against the state, or its grantee, it would mean, in some cases, that the power of the municipality to improve its harbor would be cut off unless the accreted areas were condemned. It would mean that every time the state or its grantee determined to build a wharf or pier, or to grant a permit or franchise for such construction, it would be granting away a material portion of the tidelands along the entire bay that might later be covered by artificial accretions. Such a rule would mean that the state or its grantee could thus grant into private ownership tidelands which it holds under an irrevocable trust. Such rule would permit the state or its grantees thus indirectly to convey away these tidelands, held in trust, when it cannot do so directly. Such a rule would be violative of fundamental concepts of public policy." (*Carpenter* v. *City of Santa Monica, supra,* 63 Cal.App.2d at p. 794; see also the companion case of *L.A. Athletic Club* v. *Santa Monica* (1944) 63 Cal.App.2d 795 [147 P.2d 976].)

The court in *People* v. *Hecker* (1960) 179 Cal.App.2d 823, 837 [4 Cal.Rptr. 334] also reviewed the cases, and found the rule stated in *Carpenter* v. *City of Santa Monica, supra,* 63 Cal.App.2d 772, to be "well established." (See also *South Shore Land Co.* v. *Petersen* (1964) 230 Cal.App.2d 628, 630 [41 Cal.Rptr. 277] ["Although it is true that an owner of upland may see the quantity of his land increased by natural accretion, that is, by the action of tides washing soil up along the shoreline, it is settled that such owner, having no rights or title in the tidelands, acquires no interest therein when they are filled by *artificial* means." (Italics in original.)]; *People* ex rel. *Dept. Pub. Wks.* v. *Shasta Pipe etc. Co.* (1968) 264 Cal.App.2d 520, 535 [70 Cal.Rptr. 618].)

This court has not squarely confronted the issue in recent decades, but in dicta in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 469, footnote 4 [91 Cal.Rptr. 23, 476 P.2d 423], we stated, "Generally speaking, the augmentation of existing upland by gradual natural *accretion* alters the boundary of that upland accordingly. When such augmentation occurs as a result of sudden *avulsion* or by accretion caused by the works of man, however, the boundary is not altered. (See Civ. Code, § 1014; *City of Los Angeles* v. *Anderson* (1929) 206 Cal. 662, 666-667 [275 P. 789]; *City of Newport Beach* v. *Fager* (1940) 39 Cal.App.2d 23, 31 [102 P.2d 438]; *Carpenter* v. *City of Santa Monica* (1944) 63 Cal.App.2d 772, 789-794 [147 P.2d 964]; 4 Tiffany, Real Property (3d ed. 1939) §§ 1219-1229, pp. 613-637.)" (Italics in original.)

The distinction between natural and artificial accretion was recognized in a 1947 opinion by the Attorney General. (9 Ops.Cal.Atty.Gen. 207 (1947).) The question there was whether the state, as a littoral landowner in Monterey, owned property created by " 'accretion believed to be *from natural causes . . . .* ' " (*Id.* at p. 209, italics in original.) Citing Civil Code section 1014 and case law, the Attorney General opined that the property, if accreted naturally, would belong to the state, but cautioned that "[w]e are informed that there is a possibility that the accretion in this area has occurred as a result of the construction of a breakwater into Monterey Bay north of the site in question," and that "[i]f the accretion has resulted from artificial means, a different principle of law must be applied." (9 Ops.Cal.Atty.Gen., *supra*, at p. 209.) Reviewing the case law that had developed as of that date, the opinion concluded that "[if] the construction of the breakwater caused the currents of the ocean to be interfered with and the accretion in question occurred as a direct result thereof, then the City of Monterey, and not the State of California, became the owner of the land in question." (*Id.* at p. 210.)

■ Although opinions of the Attorney General are not binding, they are entitled to considerable weight, especially when, as here, the Attorney General regularly advises agencies that administer the law (*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 829 [25 Cal.Rptr.2d 148, 863 P.2d 218]), and when the opinion is consistent with a long line of authority both before and after its issuance. **(3b)** Moreover, the distinctive California rule has been recognized by the United States Supreme Court (*California* ex rel. *State Lands Comm'n* v. *U.S.* (1982) 457 U.S. 273, 277 [73 L.Ed.2d 1, 6-7, 102 S.Ct. 2432] ["Under California law, a distinction is drawn between accretive changes to a boundary caused by natural forces and boundary changes caused by the construction of artificial objects. For natural accretive changes, the upland boundary moves seaward as the alluvion is deposited, resulting in a benefit to the upland owner. [Citation.] When accretion is caused by construction of artificial works, however, the boundary does not move but becomes fixed at the ordinary high-water mark at the time the artificial influence is introduced. [Citation.]"]), by the United States Court of Appeals for the Ninth Circuit (*United States* v. *Aranson* (9th Cir. 1983) 696 F.2d 654, 660; *Jackson* v. *United States* (9th Cir. 1932) 56 F.2d 340, 342), and by a multitude of secondary sources.[3]

This survey shows that the cases refusing to award artificial accretion to the upland owner generally involved tidelands. Because the text of Civil

---

[3]For example, 4 Witkin, Summary of California Law (9th ed. 1987) Real Property, section 119, page 336 ("The increase does not go to the owner of the land where the accretion is caused by an artificial structure such as a breakwater, erected below the line of ordinary high

Code section 1014 applies only to rivers and streams, and not to tidelands, that provision is not the only, or even the primary, source of California's rule. As the Attorney General notes, "the California rule developed as a separate strand of California common law that is independent of, but consistent with, section 1014." Its chief rationale is the need to preserve state lands that are owned in trust for the public. (*Carpenter* v. *City of Santa Monica*, *supra*, 63 Cal.App.2d at p. 794, quoted above.) In concluding that California's artificial accretion rule does not apply to disputes between private landowners, the Ninth Circuit stated that the rule is "based, first, on the state's control over obstructions erected in waterways and, second, on the statutory or constitutional inalienability of particular state lands, especially tidelands. It was created to protect the sovereign lands of the state." (*United States* v. *Aranson*, *supra*, 696 F.2d at p. 662.)

In *Patton* v. *City of Los Angeles*, *supra*, 169 Cal. at page 525, we stated that the accreted land "was once tide land, and . . . this being so, it was reserved from sale, and was not alienable by any state officer under any law, . . . and, therefore, no artificial embankment, made by third persons, or made or suffered by state officers or agents, nor any accretion to the adjacent upland caused thereby, could operate to divest the state of its title to the tide land so reserved." The court in *United States* v. *Aranson*, *supra*, 696 F.2d at page 661, quoted this language and then, considering why this reasoning would not apply to natural accretion as well as artificial, stated: "Possibly it is because artificial accretion more resembles the intentional alienation of state lands, which the California Constitution forbids, than does the process of natural accretion."

Echoing the arguments it made, and which were rejected, in *Carpenter* v. *City of Santa Monica*, *supra*, 63 Cal.App.2d 772, the CLTA argued in the Court of Appeal that accretion caused by nonnatural structures belong to the

water. In such case, the alluvion belongs to the state."); Annot., Riparian Owner's Right to New Land Created by Reliction or by Accretion Influenced by Artificial Condition Not Produced by Such Owner, *supra*, 63 A.L.R.3d at pages 295-303 (discussing California cases separately from those of other jurisdictions in recognition of its distinctive artificial-accretion rule); 5A Powell on Real Property, *supra*, section 66.04[1], page 66-34 ("California [has] consistently differentiate[d] between natural and artificially created accretions, principally related to movements along its lengthy Pacific coast."); 2 Miller and Starr, California Real Estate (2d ed. 1989) Deeds, section 6:55, page 610 ("When the accretion is caused by artificial conditions created by man, such as by a dam, dike or breakwater, California does not recognize the general rule of accretion when the state owns the bed of water below the high or low water mark. In such cases, the artificially created accretion belongs to the state as the owner of the bed beneath the adjacent water."); 2 Ogden's Revised California Real Property Law (Cont.Ed.Bar 1975) Public Lands, section 26.55, page 1288 ("Alluvial deposits due to artificial causes, as between the state or its grantees and the upland owner, belong to the former as the owner of the adjacent tidelands.").

upland owner, as long as the land was deposited gradually and imperceptibly through the action of the water. The majority agreed. It conducted a scholarly review of the accretion rule and its historical foundations, and the sources of and original intent behind Civil Code section 1014, and concluded that the statute was never intended to modify the majority common law rule. It argued that *Dana, supra*, 31 Cal. 118, properly analyzed, was not an artificial accretion case but a "purpresture (encroachment) case involving a waterfront landowner whose water boundary remained permanently fixed by statute," and that later cases misapplied it. For example, the majority stated that in *City of Los Angeles* v. *Anderson, supra*, 206 Cal. 662, "[o]nce again . . . the central premise of *Dana*—the erection of an illegal wharf in San Francisco Bay creating a purpresture or encroachment rather than an accretion—has been hijacked, without analysis, to apply to artificially accreted land resulting from a legal structure in the water." In effect, the majority held that the earlier decisions were incorrect, and that the artificial accretion rule should be abandoned in favor of a different but "fair, workable and legally supportable rule of accretion . . . ."

We disagree. California's artificial accretion rule was premised on, and is consistent with, the public trust doctrine and the inalienability of trust lands. Our cases, and Civil Code section 1014, have allowed *natural* accretion to go to private parties. The state has no control over nature; allowing private parties to gain by natural accretion does no harm to the public trust doctrine. But to allow accretion caused by artificial means to deprive the state of trust lands would effectively alienate what may not be alienated. "[A] state, as administrator of the trust in tidelands on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties." (*City of Berkeley* v. *Superior Court, supra*, 26 Cal.3d at p. 521.) This, we believe, was the driving force behind the California doctrine, and the reason it remains vital today. We thus reaffirm the continuing validity of California's artificial accretion rule.[4]

### 3. *Whether California May Apply Its Rule*

The landowners argue that California may not apply its artificial accretion rule. They contend that federal law, and specifically the rule stated in *County of St. Clair* v. *Lovingston, supra*, 90 U.S. 46, applies, not state law. This is incorrect.

---

[4]We do not intend to cast doubt upon authority indicating that the artificial accretion rule does not apply to disputes that do not involve the state, and that, therefore, do not implicate the public trust doctrine. (See *Carpenter* v. *City of Santa Monica, supra*, 63 Cal.App.2d at p. 787; *United States* v. *Aranson, supra*, 696 F.2d at pp. 660-663; 2 Ogden's Revised Cal. Real Property Law, *supra*, Public Lands, § 26.55, p. 1288.)

Although federal law may apply to oceanfront property owned by, or where ownership derives from, the federal government (*California* ex rel. *State Lands Comm'n* v. *U.S.*, *supra*, 457 U.S. 273; *Hughes* v. *Washington* (1967) 389 U.S. 290 [19 L.Ed.2d 530, 88 S.Ct. 438]), it is clear that state law applies at least to a dispute involving inland property over which the federal government has no interest. "Under the equal-footing doctrine 'the new States since admitted have the same rights, sovereignty and jurisdiction . . . as the original States possess within their respective borders.' " (*State Land Board* v. *Corvallis Sand & Gravel Co.* (1977) 429 U.S. 363, 370 [50 L.Ed.2d 550, 558, 97 S.Ct. 582]; see also *In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448, 462 [243 Cal.Rptr. 887, 749 P.2d 324].) "Once the equal-footing doctrine had vested title to the riverbed in Arizona [or, in this case, California] as of the time of its admission to the Union, the force of that doctrine was spent; it did not operate after that date to determine what effect on titles the movement of the river might have." (429 U.S. at p. 371 [50 L.Ed.2d at p. 558], overruling *Bonelli Cattle Co.* v. *Arizona* (1973) 414 U.S. 313 [38 L.Ed.2d 526, 94 S.Ct. 517].) "Under our federal system, property ownership is not governed by a general federal law, *but rather by the laws of the several States.*" (429 U.S. at p. 378 [50 L.Ed.2d at p. 563], italics added.) "This principle applies to the banks and shores of waterways, and we have consistently so held." (*Id.* at p. 379 [50 L.Ed.2d at p. 563].)

The law stated in *State Land Board* v. *Corvallis Sand & Gravel Co.*, *supra*, 429 U.S. 363, has long been applied both to navigable rivers and, generally, to tidelands. In *Barney* v. *Keokuk* (1876) 94 U.S. (4 Otto.) 324 [24 L.Ed. 224], the high court recited the familiar principle that the state, as the absolute owner of the navigable waters within its borders, can dispose of them to the exclusion of riparian owners. (*Id.* at p. 334 [24 L.Ed. at p. 227].) "It is generally conceded that the riparian title attaches to subsequent accretions to the land effected by the gradual and imperceptible operation of natural causes. But whether it attaches to land reclaimed by artificial means from the bed of the river . . . is a question which *each State decides for itself.*" (*Id.* at p. 337 [24 L.Ed. at p. 228], italics added.)

In *Shively* v. *Bowlby* (1893) 152 U.S. 1, 26 [38 L.Ed. 331, 341, 14 S.Ct. 548], the high court surveyed the laws of the original states regarding tidelands and concluded that "there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands . . . . Great caution, therefore, is necessary in applying precedents in one State to cases arising in another. [¶] . . . The new States admitted into the Union since the adoption of the Constitution

have the same rights as the original States in the tide waters, and in the lands below the high water mark, within their respective jurisdictions." "The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution." (*Id.* at pp. 57-58 [38 L.Ed. at p. 352].)

The general validity of both *Barney* v. *Keokuk, supra,* 94 U.S. 324, and *Shively* v. *Bowlby, supra,* 152 U.S. 1, was reaffirmed in *State Land Board* v. *Corvallis Sand & Gravel Co., supra,* 429 U.S. at pages 374-375, 379-380 [50 L.Ed.2d at pages 561, 563-564]. (See also *California* ex rel. *State Lands Comm'n* v. *U.S., supra,* 457 U.S. at p. 279 [73 L.Ed.2d at pp. 7-8].) We thus conclude that California may apply its own law to this case. (See also *State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d at p. 216 ["The United States Supreme Court has made it plain that the ownership of such lands is a matter of state rather than federal law."].)

The landowners also argue that because California is, and since 1850 has been, a common law state (Civ. Code, § 22.2[5]; see Stats. 1850, ch. 95, p. 219; *Strand Improvement Co.* v. *Long Beach, supra,* 173 Cal. at p. 771), they have a "vested right" either in the accretion rule as it existed in 1850, or in the current majority common law rule. We disagree. Although we adopted the general rule of accretion in *Strand Improvement Co.* v. *Long Beach, supra,* 173 Cal. at pages 771-773, nothing prevents California courts from creating exceptions to that rule. The common law is dynamic, not a monolith admitting of no variation. It was not frozen in time as of 1850. Civil Code section 22.2 does not compel California courts to "adhere[] slavishly to common law doctrines . . . ." (*State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d at p. 220.) "[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions"; therefore, "an adoption of the common law in general terms does not require, without regard to local circumstances, an unqualified application of all its rules . . . ." (*Funk* v. *United States* (1933) 290 U.S. 371, 383, 384 [78 L.Ed. 369, 376, 54 S.Ct. 212, 93 A.L.R. 1136].) As the court in *People* v. *Hecker, supra,* 179 Cal.App.2d at pages 837-838, found, the California artificial accretion rule is well established despite Civil Code section 22.2. Moreover, the rule has been shaped at least in part by state statutory and constitutional provisions. (Cal. Const., art. X, § 3; Civ. Code, §§ 670, 1014.)

The landowners also argue that to allow the state to keep artificially accreted land would constitute a taking for which compensation must be

---

[5]Civil Code section 22.2 provides: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of this State."

provided. They rely on language in *Bonelli Cattle Co.* v. *Arizona, supra*, 414 U.S. at pages 331-332 [38 L.Ed.2d at page 542], that cited the concurring opinion of Justice Stewart in *Hughes* v. *Washington, supra*, 389 U.S. at pages 294-298 [19 L.Ed.2d at pages 534-536], and suggested, without deciding, that a judicial decision depriving a private party of property in favor of the state might constitute a taking without compensation in violation of due process. Whatever one may think of this question in the abstract (we express no view), it has no relevance here. As Justice Stewart himself stated, applying "established property rules with regard to the effects of avulsion, accretion, erosion, and reliction in resolving conflicting claims to the exposed riverbed" would "not involve a retroactive alteration of state law such as would constitute an unconstitutional taking of private property." (*Bonelli Cattle Co.* v. *Arizona, supra*, 414 U.S. 313, 337, fn. 2 [38 L.Ed.2d 526, 545] (dis. opn. of Stewart, J.).) (This dissent was cited with approval in *State Land Board* v. *Corvallis Sand & Gravel Co., supra*, 429 U.S. at page 378 [50 L.Ed.2d at page 563], which overruled the principal holding of *Bonelli Cattle Co.* v. *Arizona, supra*, 414 U.S. 313—that federal law and not state law applied to the dispute of that case.) Applying California's long-standing artificial accretion rule would not constitute a taking of private property requiring compensation. (See also *State of California* v. *Superior Court (Lyon), supra*, 29 Cal.3d at pp. 231-232 [rejecting the argument that applying a public trust to certain riparian property would constitute a taking].)

We thus hold that California's artificial accretion rule may, and does, apply to this case.

### 4. *The Scope of the Artificial Accretion Rule*

It remains to define the scope of California's artificial accretion rule. In the trial court, the state cited four artificial influences it claims caused the 12 acres to accrete: hydraulic mining, wing dams, levees and dredging. The rule clearly applies to wing dams, levees and dredging in the immediate vicinity of the disputed property; the majority of the Court of Appeal erred in concluding otherwise. If these factors caused the accretion (which is yet to be determined in the superior court), it is artificial, and ownership would remain in the state. The cases discussed above admit of no other interpretation. Does the rule also apply to hydraulic mining, i.e., is accretion caused by those mining activities over a century ago artificial? This is itself an important question, for hydraulic mining had such widespread environmental effects that probably little along the Sacramento River and other rivers was unaffected by it.

Justice Scotland presented a "brief historical overview. During a colorful time in California history, hydraulic gold mining altered both the wealth of

miners and the character of California's waterways. Large quantities of water funneled with great pressure through monitors dislodged millions of cubic yards of earth in California's gold mining region. Along with the dislodged clay, sand, gravel and stone, mixed with particles of gold, the water was channeled through flumes, sluices and other conduits where the gold was extracted. The water and debris then were discharged into reservoirs and streams. Massive portions of the tailings were washed into Northern California rivers, including the Feather, American, and Sacramento rivers. By 1884, the bed of the American River had been raised 10 to 12 feet, and the bed of the Sacramento River had risen 6 to 12 feet. Due to the shallowing of these rivers, there was frequent flooding and thousands of acres of farmland were covered by mining debris. The flow of water also carried the debris through the Suisun Bay and into the San Pablo and San Francisco Bays. The adverse effect hydraulic mining had on state waterways was so great that the operations of certain mining companies were declared to be a public nuisance and were enjoined permanently. In 1893, Congress enacted legislation which prohibited hydraulic mining from harming state river systems and created the California Debris Commission. The commission was empowered to regulate hydraulic mining and prevent the discharge of mining debris into California waterways, and to commence the process of restoring the navigability of rivers and protecting their banks. (See *People* v. *Gold Run D. & M. Co.* (1884) 66 Cal. 138 [4 P. 1152]; *Gray* v. *Reclamation District No. 1500* (1917) 174 Cal. 622 [163 P. 1024]; *United States* v. *North Bloomfield G. M. Co.* (1897) 81 Fed. 243; *Woodruff* v. *North Bloomfield G. M. Co.* (1884) 18 Fed. 753.)"

The majority below, the concurring justice, and the superior court, all found that hydraulic mining does not make otherwise natural accretion artificial. We agree. California's artificial accretion exception to the general common law rule does not extend to human activities far from the site of the accretion.

Because the issue is before us on summary adjudication, the Attorney General argues first that we should not resolve it without a more developed factual record, but rather should remand the matter for a "trial on the merits." On this record, we cannot gauge the exact effect hydraulic mining had on the property at Chicory Bend. The parties agree it had some effect, but disagree how much. This is obviously a complex factual question. If it is legally relevant, evidence would have to be taken. But if it is not legally relevant, a needless trial should be avoided. We can decide that question now.

On the merits, we believe that, although theoretically alluvion placed in the river by hydraulic mining which eventually collects downstream might

be viewed as artificial, the connection between the mining and the accretion at Chicory Bend is too attenuated to render the accretion artificial under California's rule. California has modified the common law rule by adopting the artificial accretion exception, but the general rule, as stated in our cases and Civil Code section 1014, remains that accretion goes to the upland owner. The exception must not swallow the rule. In one sense, much, if not everything, along the Sacramento River and other rivers is artificial. As the superior court stated, "very little remains natural in the strictest sense as to most California rivers. Dams regulate the flow and alter the extent to which banks are eroded, for example. But to consider the entire system an artificial one would be inappropriate." Over the years, numerous human activities have indirectly as well as directly caused a change in water flow and the accumulation of sediment in virtually every river and tideland in the state. To view all of this as artificial accretion would effectively eviscerate the general rule.

Moreover, as Justice Scotland noted, there would be difficult evidentiary problems if the upland owner had " 'to trace the accretions back to their source given the period of time which has elapsed since hydraulic mining took place . . . . [S]uch a burden would be monumental, if not impossible.' " Although potentially difficult problems of proof exist even as to local human activities, that has been the situation for a substantial part of the history of this state, and such problems undoubtedly are less onerous than trying to determine the effects of 19th century hydraulic mining or other human activities far from the site of the accretion. If the artificial activity or structure is in the immediate vicinity of the accreted area, the likelihood will be greater that it is the direct, proximate cause of the accretion, rather than an indirect cause, with natural elements constituting the direct cause. Problems of proof as to the direct cause of the accretion will be minimized if the artificial accretion rule is limited to human activities in the immediate vicinity of the accreted area.

Nothing in our cases requires the broad interpretation of the rule that the state urges. With one possible exception, all of the artificial accretion cases involved local conditions—generally structures built by humans in the immediate vicinity of the accretion, but also local dredging and dumping—not activities far away like mining operations (or, as hypothesized by the majority below, dams such as the Shasta Dam). There is no need to extend the rule beyond its historical bounds, and good reason not to. We thus will interpret the scope of the rule as narrowly as our cases permit.

The one possible exception is *People* ex rel. *Dept. Pub. Wks.* v. *Shasta Pipe etc. Co., supra*, 264 Cal.App.2d 520. That decision predominantly

involved issues other than artificial accretion, but its factual recitation stated that "[d]uring the early 1860's the channel of the river opposite Oroville moved a considerable distance south of its natural location due to hydraulic mining operations in the immediate area and upstream. In the early 1940's the channel was straightened and moved still farther south of its original location as a result of further mining and dredging operations." (*Id.* at p. 524.) In the midst of the lengthy opinion is stated that "when the river shifted to a new location as a result of unnatural forces, the state did not acquire title to the bed of the stream in the new location," and also "did not lose title to the bed of the stream in the old location . . . ." (*Id.* at p. 535.) No authority is cited, and there is no further factual statement or legal analysis. The Attorney General argues this shows that hydraulic mining may cause artificial accretion. However, as the justices below noted, the opinion does not even make clear whether the river moved as a result of accretion or avulsion. As noted earlier, avulsion, natural or unnatural, does not generally benefit the upland owner. (Civ. Code, § 1015.) Moreover, it is not clear that the court had in mind the mining or the dredging operations, or both, when it referred to "unnatural forces." Especially absent discussion of the other artificial accretion cases, that decision is not authority for the proposition that hydraulic mining can make accretion artificial.

Justice Scotland took the view that "it is the artificial nature of the ultimate cause of the accretion, not the artificial nature of the source of the resulting alluvion, which determines whether the alluvion inures to the benefit of the state or the riparian owner." The Attorney General challenges this, citing language in some of the cases suggesting that the *source* of the alluvion can also make it artificial. (E.g., *City of Los Angeles* v. *Anderson, supra,* 206 Cal. at pp. 665-666; *Carpenter* v. *City of Santa Monica, supra,* 63 Cal.App.2d at pp. 776-777, 781, 782.) ■ We need not confront this, for we perceive the rule to be slightly different. The dichotomy is not between the source of the alluvion and the forces that caused it to accrete. For example, as indicated in the cases the Attorney General cites, local dumping as well as human structures or dredging might cause artificial accretion. (Dumping might also cause avulsion, but that need not be the determining point.) Rather, the cases have involved *local* human activity that directly caused the accretion. That is the critical distinction. Only if the artificial activity was near enough to the accretion to have directly caused it can the accretion be deemed artificial.

We thus hold, consistent with our prior cases, that accretion is artificial if directly caused by human activities, such as the dredging, wing dams or levees cited in this case, that occurred in the immediate vicinity of the

accreted land. Accretion is not artificial merely because human activities far away contributed to it. The dividing line between what is and is not in the immediate vicinity will have to be decided on a case-by-case basis, keeping in mind that the artificial activity must have been the *direct* cause of the accretion before it can be deemed artificial. The larger the structure or the scope of human activity such as dredging or dumping, the farther away it can be and still be a direct cause of the accretion, although it must always be in the general location of the accreted property to come within the artificial accretion rule.

■ It is undisputed that Chicory Bend is many miles from the hydraulic mining areas. Therefore, the superior court properly granted summary adjudication on this issue. Because the summary adjudication applied only to hydraulic mining, and not to the other alleged causes of the accretion—which remain to be litigated—the Court of Appeal correctly denied the state's petition for writ of mandate.

C. *Attorney Fees*

■ The landowners have moved this court for an award of attorney fees under California's private attorney general statute, Code of Civil Procedure section 1021.5.[6] We need not decide whether they would otherwise be entitled to attorney fees under that statute, for a different provision precludes the award.

Public Resources Code section 6461 provides: "Any person or persons claiming any interest in or to real property which is alleged to be claimed by the State of California to be situated in the former bed of a navigable river or stream in the State, may bring suit against the State of California, in accordance with law in any court of competent jurisdiction of the State, to quiet title to such property and may prosecute the action to final judgment. *If the judgment be against the State in such suit, no costs shall be recovered against the State.*" (Italics added.)

The landowners argue that the "claim at stake here is much broader" than that described in Public Resources Code section 6461 because this case

---

[6]Code of Civil Procedure section 1021.5 provides, as pertinent: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

involves the common law rule of accretion and Civil Code section 1014. The argument does not aid them. Although the legal issues may not have been precisely stated in Public Resources Code section 6461, the statute clearly covers this action to quiet title to 12 acres of real property that the state claims is situated in the former bed of a navigable river.

The landowners also argue that because the statute mentions only "costs" and not also attorney fees, it does not preclude the latter. We disagree. Code of Civil Procedure section 1032, subdivision (b), provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Among the items "allowable as *costs* under Section 1032" are "Attorney fees, when authorized by . . . [¶] . . . Statute." (Code Civ. Proc., § 1033.5, subd. (a)(10)(B), italics added.) Accordingly, the "costs to which a prevailing party are entitled include attorney's fees authorized by statute." (*Merced County Taxpayers' Assn.* v. *Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].) We conclude that by precluding the broad category of "costs," the Legislature also intended to preclude the included category of attorney fees.

The motion for an award of attorney fees is denied.

### III. DISPOSITION

The judgment of the Court of Appeal denying the petition for writ of mandate is affirmed.

Lucas, C. J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring.—I agree with the views of Justice Kennard explicating her dissent in *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119].

Although I, too, wrote separately in *Neary* at p. 286), I must confess that in retrospect it appears my conclusion there—invoking the appellate court's discretion—may.seem somewhat equivocal. It would have been preferable to have joined in Justice Kennard's forthright dissent. I now belatedly do so.

Other than the foregoing observation, I concur in the result reached by the majority.

**KENNARD, J.,** Concurring.—I join the majority in reaffirming California's "artificial accretion rule" under which the ownership of land formed over

time by accretion along a tidal or navigable body of water depends upon the primary or proximate cause of the accretion: If the accretion results from artificial activities, the land belongs to the state in trust for the public; if, however, the accretion results from natural activities, the land belongs to the riparian owner (that is, the owner of the property bordering the water). I agree also that, for purposes of this rule, accretion will be deemed artificial only if it is the direct result of human activities (such as dredging or the installation of wing dams or levees) in the immediate vicinity of the accreted land, and that accretion will not be deemed artificial "merely because human activities far away contributed to it." (Maj. opn., *ante*, at p. 80.) Thus, in this case the state cannot prevail based on evidence that 19th century hydraulic mining operations washed into the American and Feather Rivers great quantities of earth that natural river flows gradually carried far downstream, resulting eventually in the formation of the disputed 12-acre parcel along the bank of the Sacramento River at Chicory Bend.

I write separately to make one point about *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] (hereafter *Neary*), which the majority discusses and distinguishes in explaining why we denied a joint motion of the parties (the state and the riparian landowners) to effectuate a settlement by dismissing review.

In presenting their motion to dismiss review, the parties represented that they had negotiated a settlement after this court granted the state's petition for review of the published decision of the Court of Appeal, and that in their agreement they had conditioned both the settlement and the request for dismissal upon this court's issuance of an order that the Court of Appeal's opinion "shall remain unpublished."[1] In our order denying the motion, we explained that we were doing so because of "the public interest in having the important and continuing legal issues decided."

The reason stated in the order was correct and complete; no further explanation should have been required. Yet, because of this court's decision in *Neary, supra,* 3 Cal.4th 273—holding that "as a general rule, the parties should be entitled to a stipulated reversal to effectuate settlement absent a showing of extraordinary circumstances that warrant an exception to this general rule" (*id.* at p. 277)—the majority feels compelled to explain why a

---

[1]Under our Rules of Court, an opinion of the Court of Appeal that has been certified for publication by that court is superseded and will not be published if this court grants review. (Cal. Rules of Court, rule 976(d).) If this court subsequently dismisses review, thereby reinstating the Court of Appeal's opinion as the final decision of the cause, the Court of the Appeal's opinion "remains unpublished . . . unless the Supreme Court expressly orders otherwise." (*Id.,* rule 29.4(c).)

conditional settlement that, under *Neary*, would be sufficient justification to reverse a trial court judgment is not also sufficient justification to terminate appellate proceedings without a published opinion. (See maj. opn., *ante*, at p. 62.)

I dissented from this court's opinion in *Neary*, *supra*, 3 Cal.4th 273. Because of my strongly held view that "the ultimate purpose of a judgment is to administer the laws of this state, and thereby to do substantial justice," I had proposed that "[t]he presumption should be against stipulated reversal, not in favor of it." (*Neary*, *supra*, 3 Cal.4th at pp. 286-287 (dis. opn. of Kennard, J.).) As I said in *Neary:* "Parties are free at any time to settle their private dispute on terms mutually agreeable, and should be encouraged to do so. What they should not be free to do is to include within those terms of settlement the destruction of a judgment, a public product fashioned at the cost of public resources, and to require an appellate court to accomplish that destruction merely to facilitate resolution of their private dispute." (*Id.* at p. 295 (dis. opn. of Kennard, J.).) A majority of this court disagreed with me in *Neary* and in sweeping terms adopted a contrary rule giving litigants free rein to stipulate to the destruction of a judgment to effectuate settlement. (*Neary*, *supra*, 3 Cal.4th at p. 284.)

Since this court's decision in *Neary*, *supra*, 3 Cal.4th 273, the United States Supreme Court has considered these issues and has held, in a unanimous opinion, that, absent exceptional circumstances, a settlement of the parties is *not* a proper ground to vacate a prior judgment in the case, whether that judgment was rendered in the trial court or an appellate court. (*U.S. Bancorp* v. *Bonner Mall* (1994) 513 U.S. __, __ [130 L.Ed.2d 233, 243, 115 S.Ct. 386, 393].) The court explained: "As always when federal courts contemplate equitable relief, our holding must also take account of the public interest. 'Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.' [Citation.] Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments. To allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would—quite apart from any consideration of fairness to the parties—disturb the orderly operation of the federal judicial system." (*U.S. Bancorp* v. *Bonner Mall*, *supra*, 513 U.S. __, __ [130 L.Ed.2d 233, 243, 115 S.Ct. 386, 392].)

Rejecting the argument that courts should grant settlement-related stipulated reversals because the law favors settlement (an argument that figured

strongly in the majority's rationale in *Neary, supra,* 3 Cal.4th 273), the United States Supreme Court said: "A final policy justification urged by petitioner is the facilitation of settlement, with the resulting economies for the federal courts. But while the availability of vacatur may facilitate settlement after the judgment under review has been rendered and certiorari granted (or appeal filed), it may *deter* settlement at an earlier stage. *Some* litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court, or in the court of appeals, if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur. And the judicial economies achieved by settlement at the district-court level are ordinarily much more extensive than those achieved by settlement on appeal. We find it quite impossible to assess the effect of our holding, either way, upon the frequency or systemic value of settlement." (*U.S. Bancorp* v. *Bonner Mall, supra,* 513 U.S. __, __ [130 L.Ed.2d 233, 243-244, 115 S.Ct. 386, 393], original italics.)

In *Neary,* I predicted that when faced with a proposal by litigants to annul an appellate decision to effectuate settlement, this court would be forced to retreat from its sweeping approval of stipulated reversals. (*Neary, supra,* 3 Cal.4th at pp. 287-288 (dis. opn. of Kennard, J.).) What I predicted then has become reality now in this case. The majority, however, is not yet prepared to abandon *Neary* as an appropriate rule for the judgments of trial courts. We are thus left with the anomalous situation of having one rule for trial court judgments and a different and virtually opposite rule for appellate judgments. Like the United States Supreme Court (see *U.S. Bancorp* v. *Bonner Mall, supra,* 513 U.S. __, __ [130 L.Ed.2d 233, 243-244, 115 S.Ct. 386, 393]), I would afford *all* judgments substantial protection against settlement-related motions for stipulated reversal. For this reason, I do not join in that part of the majority opinion that tries to distinguish the situation here—in which the parties seek to destroy the precedential value of an appellate decision—from the situation we faced in *Neary.*